Aaron Siri (Pro Hac Vice To Be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (Pro Hac Vice To Be Filed)
Email: ebrehm@sirillp.com
SIRI & GLIMSTAD LLP
11201 North Tatum Boulevard
Suite 300
Phoenix, AZ 85028
Telephone: 602-806-9975

Sam M. Muriella (SBN 132284)
Email: sammuriella@yahoo.com
111 Pacifica
Suite 140
Irvine, CA 92618
Telephone: 949-412-3586

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| THE INFORMED CONSENT ACTION NETWORK, and DEL BIGTREE, <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE LLC and FACEBOOK, INC., <br><br> Defendants. | Civil Action No.: <br><br> **COMPLAINT FOR:** <br><br> **1.** *BIVENS* **VIOLATIONS; AND** <br> **2. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs the Informed Consent Action Network ("ICAN") and Del Bigtree (collectively "Plaintiffs"), by their attorneys Siri & Glimstad LLP, as for their Complaint allege on personal information as to themselves and on information and belief as to all other things the following claims against YouTube LLC, ("YouTube") and Facebook, Inc. ("Facebook") (collectively "Defendants"):

1

**COMPLAINT**

**INTRODUCTION**

1.      One of the fundamental tenants of our democracy is that the First Amendment prohibits government officials from censoring speech they dislike or disagree with.  For this principal to have meaning, a government official cannot use a private actor as a cat's paw to censor speech they dislike or disagree with.  Nevertheless, this matter presents just such a situation, where government actors used threats to Defendants' businesses to force them to censor speech that the government actors knew they were prohibited from censoring directly.

2.      In the early days of the internet, Congress included in the Communications Decency Act of 1996 a provision at Section 230 that says that **"No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"** (47 U.S.C. § 230).  Put simply, this provision protects online hosting and social media companies, like Defendants, against a range of laws that might otherwise be used to hold them legally responsible for what their users say and do.  This provision has been called "the most important law protecting internet speech"[1] and is credited with allowing social media to thrive online as forums for users to share ideas faster and more efficiently than ever before.

3.      Nevertheless, after the 2016 election, government officials were concerned with potential foreign influence in that election through misuse of Defendants' platforms.  As such, members of Congress, such as Chairman Adam Schiff, actively took measures to respond to the threat and launched a series of investigations to prevent the election process from being compromised in the future.  These measures included requiring social media companies, including Defendants, to share information they possessed with law enforcement agencies and to collaborate with these agencies to prevent a repeat of the Russian interference.  In connection with the threats and investigations, Congress also openly

---

[1] https://www.eff.org/issues/cda230 (last visited Dec. 21, 2020).

**COMPLAINT**

questioned whether to eliminate Section 230 in order to make companies like Defendants more "accountable" for what users put on their sites.

4.      Typically, social media companies like Defendants thrive on user traffic.  The more people who come to the sites, the more advertising the companies can sell.  This business model, coupled with protection from Section 230, meant that before 2016 there was little incentive for Defendants to censor their users' free speech.  Even if the Defendants disliked or disagreed with postings – like efforts to influence an election – the Defendants still could make money selling ads on those disfavored postings.  Nonetheless, the threats by members of Congress against Defendants were successful because if Defendants lost the protection from Section 230, they would be forced to significantly censor their users' postings (which would decrease traffic) or risk enormous liability from defamation actions.  As such, they made the pragmatic decision that censoring some illegal speech like that which influenced the 2016 election was preferable to loosing Section 230.  Thus, Defendants complied with the Congressional demands and took active steps to rid their platforms of fake profiles and to make their political ad sale model more transparent.  These efforts were rightfully applauded because the alleged foreign interference was illegal and an appropriate target for government action.

5.      However, having found a tool in Defendants to limit speech for a justifiable purpose, Chairman Schiff decided to use this same tool to limit other speech that, while not illegal, he did not like.  Chairman Schiff considered so called "vaccine misinformation" to be dangerous.  Therefore, he wrote letters to Defendants probing into the steps taken by Defendants to combat what he defined as "vaccine misinformation."

6.      Plaintiff ICAN, a non-profit entity, and its founder, Mr. Bigtree, are committed to providing the public with accurate information about health-related issues in order to allow citizens to make informed medical decisions.  Since 2016 they have carried out their mission through, among other things, posting episodes of their internet talk show, "The HighWire with Del Bigtree" ("The

3

HighWire"), on channels or pages on Defendants' platforms.  Since the beginning of the COVID-19 pandemic, ICAN has gathered and disseminated medical opinions by scientists, doctors, and other industry professionals in order to shine a light on the different perspectives through which the public can understand the pandemic.  It has also submitted numerous FOIA requests for information regarding potential vaccines and disseminated that information widely.  At times, the information that ICAN disseminates contradicts the government orthodoxy or policy, and that is how ICAN found itself a target in Chairman Schiff's war on disfavored speech.

7.    Despite ICAN having posted on Defendants' platforms for years, soon after Chairman Schiff issued his threatening letters concerning vaccine information, Defendants terminated or greatly restricted ICAN's ability to post information on their networks.  On July 29, 2020, YouTube terminated ICAN's channel, "The HighWire," stating that the content on the channel violated YouTube's Terms of Service ("YouTube's Terms").  This termination was not preceded with any warnings or, as YouTube's Terms refer to them, "strikes."

8.    Similarly, Facebook started by removing several videos from Plaintiffs' Facebook page, "The HighWire with Del Bigtree" and on November 21, 2020, Facebook, terminated this page altogether.

9.    The loss of these two platforms for ICAN cannot be understated.  As the recent anti-trust suit against Facebook brought by the federal government and 48 states demonstrates, Defendants control an enormous percentage of the social media market.  If ICAN is prevented from posting on Defendants' websites, it is losing its ability to reach billions of potential viewers.

10.    In moving from safeguarding our elections from foreign interference, to limiting information regarding vaccines, Chairman Schiff crossed an important line.  He moved from trying to block foreign enemies of the United States from using false information to damage our ability to hold

**COMPLAINT**

free and fair elections, to trying to stop American citizens from speaking their mind simply because he did not agree with what they are saying.

11.     In a famous unused preface to his seminal work Animal Farm, George Orwell wrote: "If liberty means anything at all, it means the right to tell people what they do not want to hear[.]"  This is a bedrock of free speech, it is how generations of American journalists have held the government to account when it has done things it would rather the public not know about.  Chairman Schiff's campaign against what he considered vaccine misinformation was clearly an attempt to restrict Americans' speech based on the content of that speech, and if he had tried to pass a law to enforce such a restriction, the courts would have quickly struck it down as a prior content-based restraint on speech.  Instead he used the leverage he had over Defendants through their reliance on Section 230 in order to have them do the dirty work he could not.

12.     Even though Defendants' motivations in succumbing to government pressure may be understandable, their actions cannot be condoned.  To allow such actions to proceed will give government actors a powerful tool to limit speech on the most popular form of media today.  ICAN now brings this action to defend itself against a governmental over-reach, accomplished through coercing Defendants into cooperation.  As a result, it seeks injunctive relief to remedy the continuing wrongs committed by Defendants that they have taken to satisfy the demands of Chairman Schiff and others like him in the government.

## PARTIES AND PERSONAL JURISDICTION

13.     Plaintiff, the Informed Action Consent Network ("ICAN"), is a Texas based non-profit with 26 U.S.C. § 513(c)(3) tax-exempt status whose mission is to raise awareness about public health safety and provide the public with accurate information so that citizens may give informed consent regarding related health interventions.  As part of its mission, ICAN investigates and disseminates information regarding public health safety issues, including through its website (available at https://

www.icandecide.org), postings on social media, press events and releases. Most importantly, ICAN carries out its activities through a rapidly growing internet-based talk show called "the HighWire with Del Bigtree" (the "HighWire").

14. ICAN has been instrumental in challenging governmental narratives regarding vaccines and drugs through various successful lawsuits against government agencies such as FDA, HHS, CDC and NIH as well as filing hundreds of FOIA requests to seek additional insight into the decision-making processes of these agencies. Through its HighWire show, ICAN sheds light on governmental oversight in the area of vaccine and drug development, produces reports from leading experts from the scientific community, disseminates the information it obtains through its legal actions, and solicits donations to fund its charitable activities.

15. Beginning in 2017, ICAN broadcasted live episodes of the HighWire through a YouTube channel until YouTube terminated ICAN's account. ICAN also maintained a Facebook page named "the HighWire with Del Bigtree" to broadcast weekly episodes of its show until Facebook terminated that page in November 2020.

16. Plaintiff Del Bigtree is the executive founder of ICAN and is the host of the HighWire. His Facebook page has over 250,000 followers and a 4.4 out of 5 rating from users. Mr. Bigtree is one of the most sought-after public speakers in the natural health arena, often gathering audiences in the thousands who travel from around the world to hear his unique blend of passion and scientific expertise. He is a long-time producer and the recipient of multiple awards including an Emmy Award, Best Drama at the New York Television Festival, and the Health Freedom Hero Award from the National Health Freedom Federation, the oldest natural health organization in America. Mr. Bigtree resides in Austin, Texas.

17. Defendant YouTube LLC is a Limited Liability Company incorporated in Delaware with its principal place of business in San Bruno, California.

**COMPLAINT**

18.     In 2017, ICAN created a channel on YouTube and executed its terms of agreement as contained in YouTube's Terms pursuant to which ICAN and YouTube consented to the personal jurisdiction of the courts in this District. *YouTube Terms of Service, About this Agreement, Governing Law* (available at https://www.youtube.com/static?template=terms) (last visited Dec. 21, 2020).

19.     Defendant Facebook, Inc. ("Facebook") is a corporation incorporated in the state of Delaware with its principal place of business in Menlo Park, California.

20.     Sometime in 2017, ICAN created a Facebook page and executed its terms of agreement, as contained in Facebook's Terms of Service ("Facebook's Terms") pursuant to which ICAN and Facebook consented to the personal jurisdiction of the courts in this District. *Facebook, Terms of Service,* ¶4(4) (available at https://www.facebook.com/legal/terms/plain_text_terms) (last visited Dec. 21, 2020).

### SUBJECT MATTER JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over the present case pursuant to 28 U.S.C. § 1331 (federal question), § 1332 (complete diversity of parties, and the amount in controversy exceeds $75,000).   This case asserts an actual controversy arising out of continuing violations of the First Amendment and the relevant contracts.   Further, the Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), since these claims are so related to claims within its original jurisdiction that they form part of the same case or controversy.

22.     The venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants transacted a substantial portion of their business in this District that gave rise to Plaintiffs' claim. Further, pursuant to YouTube's Terms as executed between YouTube and ICAN, and Facebook's Terms as executed between Facebook and ICAN, all disputes between ICAN and Defendants have to be resolved in the courts of this District and California law applies to the interpretation of these terms. *YouTube Terms of Service, About this Agreement, Governing Law* (available at https://

7

**COMPLAINT**

www.youtube.com/static?template=terms) (last visited Dec. 21, 2020); *Facebook, Terms of Service,* ¶4(4) (available at https://www.facebook.com/legal/terms/plain_text_terms) (last visited Dec. 21, 2020).

## STATEMENT OF MATERIAL FACTS

### A. Congress Grants Social Media Companies Immunity under Section 230 of the Communications Decency Act

23.     In 1996, Congress enacted § 230 of the Communications Decency Act ("**CDA**"). 47 U.C.S. § 230.  This unique provision shields the provider of an "interactive computer service" from liability by stating that such person shall not be "treated as the publisher or speaker of any information provided by another information content provider." 47 U.C.S. § 230(c)(1).  The CDA grants "protection for 'Good Samaritan' blocking and screening of offensive material." 47 U.C.S. § 230(c)(2).  In effect, it grants immunity from civil liability to a provider of interactive computer services for "any action voluntarily taken in good faith to restrict access to or availability of material that [they consider] to be [...] objectionable." 47 U.C.S. § 230(c)(2)(A).  However, 9th Circuit courts have held that this immunity does not apply to a constitutional challenge.  Nor does the immunity bar suits arising under the service contract between the interactive computer service and its users.

24.     The importance of this provision of law for the survival and continual growth of social media networks such as Defendants' networks cannot be overstated.  This piece of legislation was enacted "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.C.S. § 230(b)(1) and (2).  In the words of Facebook's Head of Security Policy, Nathaniel Gleicher, § 230 is the "shield" that is "absolutely essential for [Facebook] to do [its] work." House Intelligence Committee Hearing, June 2020 (https://www.youtube.com/watch?v=iYrpyCcVnmg) (last visited Dec.

21, 2020).  In the absence of this legislation, social media companies and the internet that we know today could not exist.

25.     In the early 2000s, social media websites and platforms began to facilitate sharing of information, ideas, and other forms of expression.  YouTube, now a wholly-owned Google subsidiary, was founded in 2004 with the same premise: to provide a platform to the public to share information via video clips.  Facebook was also founded in 2004, originally as a platform for students to connect, but later became a global platform with billions of users.

26.     Section 230 enabled social media networks to expand their reach globally at an unprecedented rate without fear that they could be held liable for what their users post.  Millions of people in this country (billions globally) use social media, specifically Facebook and YouTube, on a daily basis to exercise and enjoy their free speech rights.  Facebook and YouTube have become the modern-day equivalent of newspapers, libraries, and the public square.  Their users rely on these platforms to access and to disseminate information.

27.     Upon Google's acquisition of YouTube, YouTube formally defined the four key "values" it is based upon, which include:

- "Freedom of Expression – We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities"

- "Freedom of Information – We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small."

*YouTube About Page* (available at https://www.youtube.com/about/) (last visited Dec. 21, 2020).

28.     Facebook started with the mission "to give people the power to build community and bring the world closer together.  People use Facebook to stay connected with friends and family, to

9

discover what's going on in the world, and to share and express what matters to them." *Facebook Investor Relations, FAQs* (available at https://investor.fb.com/resources/default.aspx) (last visited Dec. 21, 2020)

29.     In order to further these missions, Facebook and YouTube originally had relatively permissive views on free speech and censorship.  As their missions indicated they were focused on the free exchange of ideas, and this led them to a policy that took a light hand to the content their users posted.  While they always retained certain rights to prevent users from using their cites for violations of the company's policies, in practice these were largely limited to true violations of law (e.g., child pornography, copyright violations, or clearly libelous statements).  In social media's new market-place of ideas users lived by the idea that more speech was a good thing and when there was a free flow of ideas good ideas, truthful ideas, would naturally rise.  In fact, YouTube never had anything in its terms of use banning so called "misinformation" until March of 2020 when it added the "COVID Misinformation" category. *See* EXHIBIT A.

**B.  Russian Actors Abuse Social Media to Spread Election Misinformation**

30.     During the 2016 Presidential election, social media platforms including YouTube and Facebook emerged as an extensively used and relied upon political news and information tools.  A Russian intelligence agency called the Internet Research Agency ("IRA") allegedly took advantage of Defendants' platforms to harm the campaign of then Presidential Candidate, Hillary Clinton. *Report On The Investigation Into Russian Interference In The 2016 Presidential Election Vol. I*, Released by the Department of Justice, March 2019 (the "Mueller Report"), (available at https://www.justice.gov/storage/report.pdf) (last visited Dec. 21, 2020).  According to the Mueller Report, the IRA commenced organizing its efforts of sabotaging the 2016 election as early as 2014 with its focus on Facebook, YouTube, and Twitter. *Id.*  The IRA subsequently expanded its operations to include Instagram and Tumblr. *Id.*  The IRA was allegedly responsible for creating fake Facebook profiles purporting to be

10

U.S. persons and fake Facebook groups which falsely claimed to be affiliated with U.S. political organizations. *Id.*  IRA's sabotage campaign also included purchases of false advertisements on Facebook that promoted IRA groups on U.S. residents' newsfeeds, and which endorsed President Trump's presidential campaign. *Id.*

31.     As a result of the social media platforms' failure to contain the illegal abuse of their services, Defendants' businesses faced immense scrutiny from Congress, law enforcement authorities, and the public in the Unites States.  Congress launched multiple investigations to assess the role played by Defendants' platforms in the Russian interference, wherein numerous public and closed hearings were held, some with top executives of Google and Facebook testifying that they had failed to take adequate security measures.  Most of the investigations scrutinized Defendants' systems in order to assess how Defendants could enhance the security and transparency of their platforms to ensure that such foreign involvement and national security breaches do not occur again.

32.     Members of Congress debated enacting legislation to make Defendants' businesses more accountable in case they did not act on their own to contain illegal threats to our democracy.  This included open discussions about legislation that would eliminate the § 230 immunity along with other measures.

33.     Specifically, on June 13, 2019, the House Intelligence Committee, chaired by Chairman Schiff, held a hearing on the risks posed by synthetic media, artificial technologies, and "deepfake" videos (which utilize artificial intelligence to create fake videos that appear to show individuals saying and doing things that those individuals never did or said).  During the Committee's hearing, Chairman Schiff openly challenged the continued appropriateness of § 230 immunity as regards social media networks and stated that "it [was] time [Congress does] away with the immunity so that the platforms are required to maintain a certain standard of care."  (https://www.youtube.com/watch?v=tdLS9MlIWOk) (last visited Dec. 21, 2020).  Chairman Schiff also told reporters that, "If the social

**COMPLAINT**

media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether that immunity still makes sense. These are not nascent industries or companies that are struggling for viability — they're now behemoths, and we need them to act responsibly." (https://www.axios.com/social-media-immunity-section-230-f15ac071-32e9-4e33-81e6-4c7ebadaea5e.html) (last visited Dec. 21, 2020).

34.     The president-elect, Joe Biden, has also openly criticized the § 230 immunity granted to the Social Media Networks.  He asserted that the immunity should be "revoked" for "propagating falsehoods   they   know   to   be   false."     https://www.theverge.com/2020/1/17/21070403/joe-biden-president-election-section-230-communications-decency-act-revoke   (last   visited   Dec.   21, 2020).

35.     The reason Chairman Schiff held the House Intelligence Committee hearings on § 230 of the CDA, and why Vice President Biden spoke out against immunity is crystal clear: the social media companies such as YouTube and Facebook were put on notice by these government officials that unless they stop illegal interference by a foreign country in the American election process, Congress would take   legislative   action   to   repeal   their   cherished   immunity   under   the   CDA   § 230.   *See*   https://abcnews.go.com/Politics/adam-schiff-accuses-social-media-companies-misinformation-negligence/story?id=71517306 (last visited Dec. 21, 2020) ("When asked what could be done to prevent social media   misinformation   and   influencing   the   2020   election,   Chairman   Schiff   hinted   at   removing 'immunity' granted to social media platforms under Section 230 of the Communications Decency Act.").

36.     It is amply clear that Defendants understand that these officials hold the proverbial Sword of Damocles over the social media companies' heads, and if the companies did not comply with the demands made by the government officials with regard to foreign interference, they would lose the current legal regime that they deem essential to their continued growth.

**COMPLAINT**

**C. Government Actors Coerce Social Media to Censor Protected Speech**

37.     The Government's intervention with Defendants' businesses to curtail election disinformation was justified because that speech was illegal.  As stated in the Mueller Report,

> The United States has a compelling interest . . . in limiting the participation of foreign citizens in activities of democratic self-government, and in thereby preventing foreign influence over the U.S. political process.' *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J., for three-judge court), *aff'd*, 565 U.S. 1104 (2012).  To that end, federal campaign- finance law broadly prohibits foreign nationals from making contributions, donations, expenditures, or other disbursements in connection with federal, state, or local candidate elections, and prohibits anyone from soliciting, accepting, or receiving such contributions or donations.

*Mueller Report* at 184.

38.     With the victory in getting Facebook and YouTube to crack down on illegal interference by Russian agents into American elections, Congressional members leading that charge had found a tool to limit speech.  They discovered that the social media companies had a clear pressure point, Section 230, and that they would bend to any request if they thought that Section 230 was in danger.

39.     However, the Congressional members  then decided to take this tool and use it not to compel social media companies to censor *illegal* speech, but rather to compel those social media companies to censor speech that Congressional members  disagreed with – speech that was legal and protected by the First Amendment.

40.     On February 14, 2019, a year before the COVID-19 pandemic, Chairman Schiff wrote a letter to Mr. Sundar Pichai, Chief Executive Officer of Google, seeking "additional information" on the steps Google was taking to curb vaccine "misinformation."    What Chairman Schiff deemed "misinformation" was not outright falsehoods, but rather any information that questioned the orthodoxy regarding vaccine safety promoted by the federal government's health agencies.  Chairman Schiff stated the following:

> YouTube is surfacing and recommending messages that discourage

13

**COMPLAINT**

parents from vaccinating their children, a direct threat to public health …
There is strong evidence to suggest that at least part of the source of this
trend is the degree to which medically inaccurate information about
vaccines surface on the websites where many Americans get their
information, among them YouTube … As a Member of Congress who is
deeply concerned about declining vaccination rates around the nation, I
… encourage further action [] be taken related to vaccine misinformation
… As more Americans rely on your services as their primary source of
information, it is vital that you take your responsibility with the
seriousness it requires.

*Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation* (Feb. 14,
2019) (available at https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-
regarding-anti-vaccine-misinformation) (last visited Dec. 21, 2020).

41.     On the same day, Chairman Schiff sent a similar letter to Mr. Mark Zuckerberg,
Chairman and Chief Executive Officer of Facebook, wherein Chairman Schiff expressed his "concern"
that "Facebook accepts paid advertising that contains deliberate misinformation about vaccines."
Chairman Schiff urged Facebook to take more active steps to curb vaccine "misinformation" on its
platform. *Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation* (Feb. 14,
2019) (available at https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-
regarding-anti-vaccine-misinformation) (last visited Dec. 21, 2020).

42.     Chairman Schiff's letters did not reference Section 230 directly, but after the pressure
applied following the Russia scandal, he did not need to.  These companies knew what the potential
consequences of ignoring these requests could be.  These pressure tactics to compel YouTube and
Facebook to censor vaccine related speech were successful.  On February 14, 2019, Facebook told media
publishing companies that it would be exploring the removal of "anti-vaccine" information from its from
software systems that recommend related content on the site. *See* Sarah Frier, *Facebook, Facing
Lawmaker Questions, Says It May Remove Anti-Vaccine Recommendations*, Bloomberg (Feb. 14, 2019)
(available                     at                     https://www.bloomberg.com/news/

**COMPLAINT**

articles/2019-02-14/facebook-says-it-may-remove-anti-vaccine-recommendations) (last visited Dec.

21, 2020).  To solidify the new policies, on March 7, 2019, Chairman Schiff revealed in a press release

the responses he received to his letters described above:

> "We have put a lot of effort into curbing misinformation in our products – from better Search ranking algorithms, to improving our ability to surface authoritative content, to tougher policies against monetization of harmful or dangerous content. Under YouTube's Advertiser-Friendly Content Guidelines, we are and have been demonetizing anti-vaccination content under our longstanding harmful or dangerous advertising policy," wrote Karan Bhatia, Vice President of Global Public Policy and Government Affairs at Google.

> "Our approach ... is to reduce the spread of inaccurate information about vaccines by reducing its distribution in News Feed, removing groups and pages that promote misinformation from recommendation surfaces, and providing authoritative information to people who might encounter it," wrote Kevin Martin, Vice President of U.S. Public Policy at Facebook.

*Schiff Receives Official Responses from Google, Facebook Regarding Anti-Vaccine Misinformation* (March 7, 2019) (available at https://schiff.house.gov/news/press-releases/schiff-receives-official-responses-from-google-facebook-regarding-anti-vaccine-misinformation) (last visited Dec. 21, 2020).  Chairman Schiff also publicly stated on his Twitter account that he had received responses from the social media companies to his February letters and that the "[t]he ultimate test will be if these measures reduce the spread of anti-vaccine content on their platforms, to the benefit of public health." https://twitter.com/RepAdamSchiff/status/1103747416065478657?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1103747416065478657&ref_url=about%3Asrcdoc (last visited Dec. 21, 2020).

43.     On the same day, Facebook Vice President, Global Policy Management, Monika Bickert, issued the following online press release:

> We are working to tackle vaccine misinformation on Facebook by reducing its distribution and *providing people with authoritative information on the topic.* We are starting by taking a series of steps:

15

**COMPLAINT**

We will reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search. These groups and Pages will not be included in recommendations or in predictions when you type into Search.

When we find ads that include misinformation about vaccinations, we will reject them. We also remove related targeting options, like "vaccine controversies." For ad accounts that continue to violate our policies, we may take further action, such as disabling the ad account.

We won't show or recommend content that contains misinformation about vaccinations on Instagram Explore or hashtag pages.
We are exploring ways to share educational information about vaccines when people come across misinformation on this topic.

**Update on April 26, 2019 at 10AM PT:** We may also remove access to our fundraising tools for Pages that spread misinformation about vaccinations on Facebook.

How This Will Work

Leading global health organizations, such as the World Health Organization and the US Centers for Disease Control and Prevention, have publicly identified verifiable vaccine hoaxes. If these vaccine hoaxes appear on Facebook, we will take action against them.

For example, if a group or Page admin posts this vaccine misinformation, we will exclude the entire group or Page from recommendations, reduce these groups and Pages' distribution in News Feed and Search, and reject ads with this misinformation.

We also believe in providing people with additional context so they can decide whether to read, share, or engage in conversations about information they see on Facebook. We are exploring ways to give people more accurate information from expert organizations about vaccines at the top of results for related searches, on Pages discussing the topic, and on invitations to join groups about the topic. We will have an update on this soon.

We are fully committed to the safety of our community and will continue to expand on this work.

*Combatting Vaccine Misinformation*, FACEBOOK, available at (https://about.fb.com/news/2019/03combatting-vaccine-misinformation) (last visited Dec. 21, 2020) (emphasis added).

16

**COMPLAINT**

44.     Chairman Schiff's pressure tactics did not end with "encouraging" Facebook and YouTube to "curb vaccine misinformation" on the internet.  With the coronavirus pandemic rapidly spreading in the United States, on April 29, 2020, after his previous letter to key YouTube and Facebook executives, Chairman Schiff once again applied governmental pressure and wrote to the social media companies, this time expanding his censorship of "vaccine misinformation" to also include "coronavirus misinformation."  Chairman Schiff's letter reminded the platforms that the best practice is to "remove or [downgrade] all harmful content before users engage with it" and urged them to adopt policies similar to that of Facebook to tackle coronavirus misinformation.  *Schiff Urges Google, YouTube, Twitter to Inform Users Who Interact With Coronavirus Misinformation* (April 30, 2020) (available at https://schiff.house.gov/news/press-releases/schiff-urges-google-youtube-twitter-to-inform-users_who-interact-with-coronavirus-misinformation) (last visited Dec. 21, 2020).

45.     Thus, now in the name of his view of public health, Chairman Schiff pushed the boundary further to silence speech concerning one of the largest and most important public issues of the last decade.  At the time, the COVID-19 pandemic was in its early phase.  There was no clear scientific consensus on every aspect of the virus and the government's response.  In fact, it was a hot-button political issue as well with Democrats and Republicans viewing the issue differently.  These are precisely the kinds of public debates that the First Amendment was designed to foster, where policy makers and the public are groping to understand an issue and all sides must be heard to ensure that good decisions can be made based on all the facts and opinions.

46.     Again, Chairman Schiff's pressure worked, and he was able to use Defendants as his tool to stifle opinions and information he disagreed with.  After Chairman Schiff's April 29th letter, YouTube CEO, Susan Wojcicki, responded explaining YouTube's coronavirus "misinformation" policies:

> We also partner closely with researchers and elected officials from around the world to better understand the challenges of online misinformation and take their recommendations for improvement seriously. *We are*

17

**COMPLAINT**

*committed to working with Members of Congress* as well as health experts around the world to better understand these challenges as we continue developing robust policy and product improvements that help keep people safe. I hope you will continue to share with me your views about our work.

*Schiff Receives Responses from YouTube and Twitter Regarding Coronavirus Misinformation* (May 28, 2020) (available at https://schiff.house.gov/news/press-releases/schiff-receives-responses-from-youtube-and-twitter-regarding-coronavirus-misinformation) (last visited Dec. 21, 2020).

47.     The looming threat of removing Section 230 immunity, first wielded for an acceptable purpose of compelling social media companies to prevent *illegal* actions was now being wielded to compel social media companies to censor *legal and protected* speech with which certain government officials disagreed.

**D. Facebook and YouTube Succumb to the Pressure and Adopt New "Misinformation" Policies**

48.     YouTube and Facebook's determinations of what is considered "misinformation" is based exclusively on what the government and supra-governmental authorities tell them to allow. Defendants perceive "vaccine misinformation" or "coronavirus misinformation" as anything that does not serve the government's goals of increasing vaccine uptake (what they might call "anti-vaccine") or any theory that is not advanced by the government.  They claim to rely on governmental and supra-governmental authorities such as the CDC and the WHO to determine which medical information concerning vaccines or the coronavirus pandemic is "misinformation."  In the process, the companies use information supplied by these organizations as authoritative, and established facts. *See Facebook Update, Keeping People Safe and Informed About the Coronavirus* ("In several countries we are directing people to their local ministry of health. For example, in the US we are directing people to information from the Centers for Disease Control and Prevention (CDC)" (available at https://about.fb.com/news/2020/10/coronavirus/) (last visited Dec. 21, 2020); *YouTube COVID-19 Medical Misinformation Policy* ("YouTube doesn't allow content that spreads medical misinformation that

18

**COMPLAINT**

contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19.") (available at https://support.google.com/youtube/answer/9891785?hl=en&hl=en&ref_topic=9282436) (last visited Dec. 21, 2020).  In effect, this made the CDC and WHO similar to the Ministry of Truth,[2] defining what the official truth was for the masses, and any information that runs contrary to their word is suppressed by the governments' agents in YouTube and Facebook.

49.   Criticizing the government is a core function of the free press in a democracy, it is how we ensure truth and honesty from the government.  Contrary to Defendants' core values or mission statements, their policies, enacted at Chairman Schiff's request, fail to recognize that members of the public are entitled to differ from the CDC or the WHO in their views and express those different views. Critically, different than tackling false information or hoaxes, Defendants' broad construction of the phrase "misinformation" – to include anything they deem "anti-vaccine" regardless of its veracity – at the behest of Chairman Schiff and his congressional colleagues impinges upon the free speech rights of Plaintiffs.

50.   YouTube's Terms and Community Guidelines (a set of rules in addition to the Terms of Service which permits users to ascertain what content is allowed and what content is disallowed from the website) ("YouTube's Community Guidelines") provide for a "three strike" system. (https://support.google.com/youtube/answer/2802032?hl=en&ref_topic=9387060) (last visited Dec. 21, 2020). If a user violates YouTube's policies, YouTube issues strikes to warn the user of the breach of terms. *Id.*  Upon receiving three strikes, YouTube reserves the right to terminate the services of the user, while the user reserves the right to appeal all of YouTube's decisions. *Id.*

---

[2] *See* Ministry of Truth, Ministries of *Nineteen Eighty-Four*, Wikipedia, https://en.wikipedia.org/wiki/Ministries_of_Nineteen_Eighty-Four#Ministry_of_Truth (Last visited December 21, 2020).

**COMPLAINT**

51.     On or about March 20, 2020, YouTube updated its Community Guidelines, to include policies specifically targeting some coronavirus information. (https://support.google.com/youtube/answer/9891785) (last visited Dec. 21, 2020).  Accordingly, "[i]f [a user's] content violates this policy, [YouTube will] remove the content." *Id.*  However, in response to the COVID-19 pandemic, YouTube suspended the three strikes system for removed content "unless YouTube's systems have high confidence that it violates [their] policies." (https://www.youtube.com/watch?v=i352PxWf_3M&feature=youtu.be) (last visited Dec. 21, 2020).  This policy allegedly allowed content providers – or at least certain content providers – to upload videos "without worrying about hitting three strikes" which would result in a permanent account termination.

52.     Much like YouTube, Facebook also updated its "misinformation" policies in April 2020, contained in its Community Standards (a set of rules in addition to the Terms of Service which permits users to ascertain what content is allowed and what content is disallowed from the website) ("Facebook's Community Standards") to specifically tackle coronavirus misinformation.   As part of these new policies, Facebook claimed that it partnered with more fact checkers to increase its fact checking capabilities. https://about.fb.com/news/2020/04/covid-19-misinfo-update/ (last visited Dec. 21, 2020). These fact checkers were also paid by Facebook. *Id.*  Facebook further stated that "once a piece of content is rated false by fact-checkers, [it] reduce[s] its distribution and show[s] warning labels with more context." *Id.*

53.     To reaffirm its stance, Facebook adopted another policy in October 2020, whereby it prohibited ads that discouraged vaccines. *See* https://about.fb.com/news/2020/10/supporting-public-health-experts-vaccine-efforts/ (last visited Dec. 21, 2020).  However, even in this policy, Facebook did not adopt an outright ban on "anti-vaccine" content or groups.

**COMPLAINT**

**E.  YouTube Shuts Down The HighWire's Page Without Warning**

54.    In 2017, ICAN started the internet talk-show the HighWire to disseminate the latest medical news and information in the area of human health and to provide a platform for scientists and experts to debate and express their opinions.  In order to broadcast the show, ICAN created a YouTube channel in 2017 by executing the website's terms of service.  From 2017 through July 2020, ICAN maintained its YouTube channel by broadcasting a new live video every Thursday.  ICAN also actively used the HighWire episodes to solicit donations from its viewers to raise funds to carry out its not-for-profit operations.  The HighWire's popularity was increasing rapidly and by 2020 ICAN's YouTube page boasted over 250,000 subscribers worldwide.

55.    ICAN always abided by YouTube's Terms and YouTube's Community Guidelines. Given its importance in disseminating information, ICAN valued its YouTube Channel.  Thus, prior to July 2020, when Chairman Schiff sent his letter, ICAN never received a single complaint or "strike" from YouTube regarding any of its videos.

56.    Despite its policy change to its "three strike" system, on July 3, 2020, YouTube commenced its systematic attack against Plaintiffs' channel, The HighWire.  YouTube took down a video featuring a doctor discussing hydroxychloroquine, stating that this video violated YouTube's community guidelines.  However, YouTube informed The HighWire that this removal "ha[d] not" resulted in a strike against the channel.  Over the following four weeks, YouTube took down seven other videos on The HighWire, each time notifying The HighWire that the removals "ha[d] not" resulted in a strike against the channel.  Yet, on Wednesday, July 29, 2020, YouTube terminated Plaintiffs' channel "The HighWire" without any warnings, alleging that "the activity in [The HighWire's] account violates [YouTube's] terms of service."  All notifications received by Plaintiffs from YouTube are attached as EXHIBIT B.

**COMPLAINT**

57.     YouTube's termination of ICAN's channel was in bad faith since it was without cause and was not accompanied with a fair warning.  Further, the termination was not in accordance with YouTube's Terms of Service since Plaintiffs had not repeatedly or materially breached the Agreement with YouTube; there was no legal requirement or court order with which YouTube had to comply by suspending or terminating ICAN's channel; and YouTube did not believe there was conduct that created or could create liability or harm to any user or third party, YouTube or its affiliates. *See YouTube's Terms,* "*Account Suspension and Termination.*"

58.     This abrupt and unexpected termination caused ICAN to lose all of its 250,000 subscribers who regularly watched the weekly episodes.  The termination also left ICAN with less than 24 hours to find alternative avenues to broadcast the next episode of its show on July 30, 2020.  ICAN further lost all its historical analytical data and videos uploaded on YouTube since 2017.  ICAN and its viewers were effectively locked out of viewing any content it had ever uploaded on YouTube and all data associated with such content.  Since the termination, ICAN has had to raise and expend thousands of dollars to get its own website up and running and re-upload all the previous episodes and other educational materials it routinely provides its viewers.  The termination not only impacted ICAN, but other medical professionals as well who appeared on the show and used ICAN's YouTube links on their own individual websites and social media to help disseminate educational materials.

59.     ICAN followed YouTube's appeals mechanisms to no avail.

**F. Facebook Takes Down ICAN's Videos and Then Shuts Down The HighWire's Page Without Warning**

60.     ICAN maintains two pages on Facebook, one under the name of "Informed Action Consent Network" and the other "The HighWire with Del Bigtree" ("ICAN's Facebook Pages"). ICAN used the HighWire page for the same purposes it used the YouTube channel prior to its termination, that

**COMPLAINT**

is, to make available weekly episodes of the HighWire for its viewers.  The HighWire Facebook page had a following of over 360,000 users with over 30 million views on its videos.

61.    On or about July 7, 2020, Facebook took down one of the HighWire's videos from its page stating that, "[the] post goes against [Facebook's] Community Standards on misinformation that can cause physical harm."  Several videos were removed thereafter with similar vague explanations from Facebook.

62.    On November 21, 2020, Facebook joined YouTube in de-platforming ICAN by "unpublishing" the HighWire Facebook page.  This purge was not preceded by any warning, nor was it supported by adequate reasoning by specification of a particular violation.  All notifications received from Facebook are attached as EXHIBIT C.

63.    ICAN always abided by Facebook's Terms and Facebook's Community Standards. Given its importance in disseminating information, ICAN valued its Facebook page.  Thus, prior to July 2020, ICAN never received a single complaint from Facebook regarding any of its videos.

64.    Facebook's removal of ICAN's videos and unpublishing HighWire's Facebook Page were actions taken in bad faith since they were without cause and were not accompanied with a fair warning.  Further, the termination was not in accordance with Facebook's Terms since Plaintiffs had not seriously or repeatedly breached Facebook's Terms or Community Standards; Plaintiffs did not repeatedly infringe other people's intellectual property rights; nor was Facebook required to terminate the HighWire's page for legal reasons. *See Facebook's Terms,* ¶4.2.

65.    Facebook's actions have caused ICAN to lose its 360,000 followers on Facebook and all its analytical data pertaining to all videos uploaded since 2017.  Facebook's actions have severely curtailed ICAN's ability to reach its followers and raise funds to carry out its charitable mission.

66.    It is apparent that YouTube and Facebook took the actions of removing the HighWire's videos from their platforms after succumbing to the pressure created by certain governmental officials

23

**COMPLAINT**

abusing their authority.  YouTube and Facebook arguably have some rights to moderate content on their platforms, however, in the present case, the actions taken by Defendants are illegal because they were taken in bad faith and came as the result of governmental pressure on the companies.  Such actions, therefore, violated the company's terms of service and Plaintiffs' First Amendment rights.

67.     Before this pressure was applied, Defendants had never removed ICAN's content.  On information and belief, in the absence of governmental pressure, Defendants would not have purged The HighWire's platforms.  Indeed, on July 27, 2020, a video made by several practicing doctors treating COVID-19 patients began circulating on YouTube and Facebook.  Facebook let the video circulate for five hours before it was removed, during which time the video had over 20 million views and received 100 thousand comments.  Similarly, YouTube took the video down only after it had already reached over 200,000 views.  Facebook and YouTube clearly saw a business incentive in leaving the video up for some time although it allegedly violated the Companies' Community Standards, Terms of Service, and Misinformation Policies.

**G.  Government Officials Call Out Defendants for Violating the First Amendment**

68.     On May 28, 2020, President Trump – obviously taking issue with improper censorship – introduced an executive order seeking clarifications as to the scope of immunity under § 230 of the CDA.  https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/ (last visited Dec. 21, 2020).  The President said the social media companies "have had unchecked power to censor, restrict, edit, shape, hide, alter any form of communication between private citizens or large public audiences…We are fed up with it."  President Trump further said he was taking the action to "defend free speech from one of the gravest dangers it has faced in American history."  https:// www.msn.com/en-us/news/politics/coronavirus-government-response-updates-trump-gives-first-reaction-to-100000-deaths/ar-BB14IudM (last visited Dec. 21, 2020).

24

**COMPLAINT**

69.     Other politicians who have not agreed with the censorship occurring, unlike Chairman Schiff and his congressional colleagues, have recognized and called out Defendants' incessant censorship of differing views as unconstitutional.   In the July 29, 2020 Antitrust Sub-Committee Hearing, Reps. Jim Sensenbrenner, Greg Steube, and Jim Jordan recognized that Social Media Networks have been baselessly censoring views and taking advantage of the immunity § 230 of the CDA provides. https://www.youtube.com/watch?v=WBFDQvIrWYM&t=15783s (last visited Dec. 21, 2020).

70.     The Department of Justice ("**DOJ**") has also identified four "ripe" areas for reforms to § 230 of the CDA.   (https://www.justice.gov/ag/department-justice-s-review-section-230-communications-decency-act-1996?utm_medium=email&utm_source=govdelivery) (last visited Dec. 21, 2020).   One of those areas is "promoting open discourse and greater transparency." *Id.*   The DOJ recommends that "the vague catch-all 'otherwise objectionable' language in § 230(c)(2) [should be replaced] with 'unlawful' and 'promotes terrorism.'" *Id.*   The objective of "[t]his reform [is to] focus the broad blanket immunity for content moderation decisions on the core objective of Section 230—to reduce online content harmful to children—while limiting a platform's ability to remove content arbitrarily or in ways inconsistent with its terms or service simply by deeming it 'objectionable.'" *Id.* Second, the DOJ "proposes adding a statutory definition of 'good faith,' which would limit immunity for content moderation decisions to those done in accordance with plain and particular terms of service and accompanied by a reasonable explanation, unless such notice would impede law enforcement or risk imminent harm to others.   Clarifying the meaning of 'good faith' should encourage platforms to be more transparent and accountable to their users, rather than hide behind blanket Section 230 protections." *Id.*

71.     Defendants market their online platforms as public forums intended to protect free speech and spheres where people can exchange ideas and express their views and opinions freely.   According to YouTube, "voices matter" and YouTube is "committed to fostering a community where everyone's

**COMPLAINT**

voice can be heard." Similarly, Facebook views itself as a virtual sphere where people can "talk openly about the issues that matter to them, even if some may disagree or find them objectionable." Yet, they have bent to government officials to censor views these government officials do not agree with.

### FIRST CAUSE OF ACTION

### FIRST AMENDMENT OF THE U.S. CONSTITUTION – *BIVENS* VIOLATIONS

### Against Defendants YouTube and Facebook

72.    Plaintiffs restate and reallege paragraphs 1-71 of this Complaint and incorporate them herein by reference.

73.    Plaintiffs have brought this private damage action to seek redress for violation of their First Amendment rights under *Bivens*. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 402 U.S. 388 (1971) (holding that there exists an implied private damage remedy against state agents acting under the color of law for violating the Fourth Amendment rights of the plaintiff).

74.    Plaintiffs' videos on their YouTube channel and Facebook pages were designed to educate and disseminate medically relevant information to the American public and were thus, constitutionally protected speech under the First Amendment.

75.    Governmental actors misused the power of their position and coerced private entities to do their bidding. Defendants' businesses are premised on making things go viral in order to reach maximum viewers, and then selling advertising to those viewers. As a result, Defendants have little economic incentive to engage in censorship of content that the public finds appealing, because doing so runs contrary to their economic interests. When viewed in light of Defendants' business models, it is clear that Defendants would not have taken the decision to censor Plaintiffs' protected speech absent coercion or significant encouragement from key government officers.

76.    Defendants, thus, should be treated as state actors because they acted based on the encouragement, coercion, and/or threats of powerful government officials.

**COMPLAINT**

77.     Defendants' restriction of Plaintiffs' speech is both content and viewpoint based since Defendants are targeting vaccine related speech and seek to suppress viewpoints the government officials they serve do not agree with, in violation of the First Amendment.

78.     The publicly available information stated above shows the existence of interdependence between Chairman Schiff and the Defendants.  YouTube and Facebook willfully participated with Chairman Schiff and public health authorities such as the CDC to frame their policies surrounding so called "vaccine misinformation" or "coronavirus misinformation" and take the action of censoring Plaintiffs' content on Defendants' platforms.  Any further information that may be relevant to sufficiently prove the existence of such interdependence is within the private control of Chairman Schiff and Defendants, and which can only be revealed through discovery.

79.     Plaintiffs have suffered and continue to suffer an immediate and irreparable injury as a direct and proximate result of Defendants' arbitrary and capricious actions.  Plaintiffs injuries include loss of revenue, loss of viewership, damage to Plaintiffs' goodwill and reputation, for which there exists no adequate remedy at law.

## SECOND CAUSE OF ACTION

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### Against Defendant YouTube

80.     Plaintiffs restate and reallege paragraphs 1-79 of this Complaint and incorporate them herein by reference.

81.     Plaintiffs entered into a contract with Defendant YouTube consisting of YouTube's Terms.

82.     Pursuant to this contract, YouTube consented to ICAN's use of its platform for uploading its videos, so long as they did not violate YouTube's Terms.  At all times relevant here, Plaintiffs complied with and did all or substantially all of the things required of them under YouTube's Terms.

**COMPLAINT**

83.     Like every contract, YouTube's Terms included an implied obligation on the part of both parties to act in good faith and of fair dealing, this included an obligation for YouTube to exercise in good faith any discretion granted it under the contract.

84.     YouTube unfairly and in bad faith interfered with Plaintiffs' right to receive the benefits of the contract by, *inter alia*, taking down ICAN's channel without cause or notice for the unlawful purpose of stifling Plaintiffs' free speech rights at the behest of powerful government officials.

85.     YouTube, thus, breached this contract's implied covenant of good faith and fair dealing when it terminated ICAN's channel without cause.

86.     YouTube's breach of this covenant has caused Plaintiffs damages in an amount exceeding $75,000 that will be proved at trial.

## THIRD CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

#### Against Defendant Facebook

87.     Plaintiffs restate and reallege paragraphs 1-86 of this Complaint and incorporate them herein by reference.

88.     Plaintiffs entered into a contract with Facebook consisting of Facebook's Terms.

89.     Pursuant to this contract, Facebook consented to ICAN's use of its platform for uploading its videos, so long as they did not violate Facebook's Terms.  At all times relevant here, Plaintiffs complied with and did all or substantially all of the things required of them under Facebook's Terms.

90.     Like every contract, Facebook's Terms included an implied obligation on the part of both parties to act in good faith and of fair dealing, this included an obligation for Facebook to exercise in good faith any discretion granted it under the contract.

91.     Facebook unfairly and in bad faith interfered with Plaintiffs' right to receive the benefits of the contract by, *inter alia*, taking down Plaintiffs' videos and the HighWire's page without cause or

**COMPLAINT**

notice for the unlawful purpose of stifling Plaintiffs' free speech rights at the behest of powerful government officials.

92.     Facebook, thus, breached this contract's implied covenant of good faith and fair dealing when it removed ICAN's videos without cause.

93.     Facebook's breach of this covenant has caused Plaintiffs damages in an amount exceeding $75,000 that will be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter Judgment against YouTube and Facebook as follows:

1.     An order directing YouTube to restore ICAN's YouTube channel to the state it was on July 29, 2020;

2.     An order directing Facebook to restore ICAN's and the HighWire's Facebook Page to the state they were in on July 7, 2020;

3.     An order enjoining Defendants from restricting Plaintiffs' speech as set forth in this Complaint;

4.     An award for damages against YouTube for breach of the implied covenant of good faith and fair dealing;

5.     An award for damages against Facebook for breach of the implied covenant of good faith and fair dealing;

6.     An award for Plaintiffs' reasonable attorney fees, costs and expenses; and

7.     Such other and further relief as this Court should find just and proper

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

**COMPLAINT**

Dated:  December 30, 2020

Aaron Siri (Pro Hac Vice To Be Filed)
Email: aaron@sirillp.com
Elizabeth A. Brehm (Pro Hac Vice To Be Filed)
Email: ebrehm@sirillp.com
SIRI & GLIMSTAD LLP
11201 North Tatum Boulevard
Suite 300
Phoenix, AZ 85028
Telephone:  602-806-9975

*/s/ Sam M. Muriella*
Sam M. Muriella (SBN 132284)
Email: sammuriella@yahoo.com
111 Pacifica
Suite 140
Irvine, CA 92618
Telephone: 949-412-3586

*Attorneys for Plaintiffs*

30

**COMPLAINT**