1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Aaron Siri (*Pro Hac Vice*)
Email: aaron@sirillp.com
Elizabeth A. Brehm (*Pro Hac Vice*)
Email: ebrehm@sirillp.com
SIRI & GLIMSTAD LLP
200 Park Avenue
17th Floor
New York, NY 10166
Telephone: 212-532-1091

Sam M. Muriella (SBN 132284)
Email: sammuriella@yahoo.com
111 Pacifica
Suite 140
Irvine, CA 92618
Telephone: 949-412-3586

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| THE INFORMED CONSENT ACTION NETWORK, and DEL BIGTREE,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE LLC and FACEBOOK, INC.,<br><br>Defendants. | Civil Action No.: 4:20-CV-09456-JST<br><br>**AMENDED COMPLAINT FOR:**<br><br>***BIVENS* VIOLATIONS**<br>**JURY TRIAL DEMANDED** |

Plaintiffs the Informed Consent Action Network ("ICAN") and Del Bigtree (collectively "Plaintiffs"), by their attorneys Siri & Glimstad LLP, as for their Complaint allege on personal information as to themselves and on information and belief as to all other things the following claims against YouTube LLC, ("YouTube") and Facebook, Inc. ("Facebook") (collectively "Defendants"):

1

**AMENDED COMPLAINT**

**INTRODUCTION**

1.      The Supreme Court has described "the right to criticize the government" as "the heart of what the First Amendment is meant to protect." *McConnell v Fed. Election Com'n*, 540 US 93, 248 (2003).  Questioning, scrutinizing, and holding the government to account are what have allowed the United States to peacefully grow and improve over its 232-year history.  This is why the First Amendment prohibits government officials from censoring speech they dislike or disagree with.  For this principle to have meaning, government officials cannot use a private actor as a cat's paw to censor speech they dislike or disagree with.  Nevertheless, this matter presents just such a situation where government actors used threats to Defendants' businesses to force them to censor speech that the government actors knew they were prohibited from censoring directly.

2.      Plaintiff ICAN, a non-profit entity, and its founder, Mr. Bigtree, have been dedicated to criticizing governmental positions on health-related issues since ICAN's founding in 2016.  In part, ICAN does this by providing the public with accurate information about health-related issues, including vaccination, in order to allow citizens to make informed medical decisions.  Plaintiffs are part of a long tradition in this country of outside organizations set up by citizens to counter or criticize the actions of the government in order to advocate for changes in policy.  Like the National American Woman's Suffrage Association agitating for women's rights to vote, the NAACP criticizing states' Jim Crow policies, or student organizations questioning the U.S. government's policies during the Vietnam War, ICAN was created in part to scrutinize government policies with the goal of effecting positive changes.  Like the groups that came before it, ICAN's positions are not always popular at the time, especially with those who hold power, but such organizations play a vital role in questioning and advocating for change.  Government health agencies, including those that set vaccine and public health policies, are just like any other part of the government, and their actions must be scrutinized like any other agency.

2

**AMENDED COMPLAINT**

3.      Since 2016, ICAN and Mr. Bigtree have carried out their mission through, among other things, posting episodes of their internet talk show, "The HighWire with Del Bigtree" ("The HighWire"), on channels or pages on Defendants' platforms.  Through the end of 2019, Defendants almost never censored any of Plaintiffs' content.  This makes sense, social media companies like Defendants thrive on user traffic.  The more people who come to the sites, the more information about users can be generated and the more advertising the companies can sell.  This business model meant that there was little incentive for Defendants to censor their users' free speech.  Even if the Defendants disliked or disagreed with postings, Defendants could still make money selling ads on those disfavored postings.

4.      Defendants could permit such disfavored speech because, in the early days of the internet, Congress included in the Communications Decency Act of 1996 a provision at Section 230, which states that: **"No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"** (47 U.S.C. § 230). Put simply, this provision protects online hosting and social media companies, like Defendants, against a range of laws that might otherwise be used to hold them legally responsible for what their users say and do.  This provision has been called "the most important law protecting internet speech"[1] and is credited with allowing social media to thrive online and serve as forums for users to share ideas faster and more efficiently than ever before.

5.      Nevertheless, after the 2016 election, government officials were concerned with potential foreign influence in that election through misuse of Defendants' platforms.  As such, members of Congress, such as Chairman Adam Schiff, actively took measures to respond to the threat and launched a series of investigations to prevent the election process from being compromised in the future.  These

---

[1] https://www.eff.org/issues/cda230 (last visited Dec. 21, 2020).

**AMENDED COMPLAINT**

measures included requiring social media companies, including Defendants, to share information they possessed with law enforcement agencies and to collaborate with these agencies to prevent a repeat of the Russian interference. In connection with the threats and investigations, Congress also openly questioned whether to regulate or even break up the large social media companies like Defendants. Among those discussions, several Members of Congress openly suggested eliminating Section 230 in order to make companies like Defendants more "accountable" for what users put on their sites.

6. The threats by members of Congress against Defendants were successful. No industry wants additional regulation, and social media companies have become particularly sensitive because if Defendants lose the protection from Section 230, they would be forced to significantly censor their users' postings (which would decrease traffic) or risk enormous liability from defamation actions. As such, they made the pragmatic decision that censoring some illegal speech, like that which influenced the 2016 election, was preferable to losing Section 230.

7. However, having found they could limit speech for a justifiable purpose, several government officials decided to use similar threats to limit other speech that, while not illegal, they did not like, or viewed as contrary to government positions they favored. These officials, including Adam Schiff, a powerful Member of Congress, considered so called "vaccine misinformation" to be dangerous. Therefore, Chairman Schiff wrote letters to Defendants probing into the steps taken by Defendants to combat what he defined as "vaccine misinformation" while other officials made public threats towards Defendants.

8. Since the beginning of the COVID-19 pandemic, ICAN has gathered and disseminated medical opinions by scientists, doctors, and other industry professionals in order to shine a light on the different perspectives through which the public can understand the pandemic. It has also submitted numerous FOIA requests for information regarding potential vaccines and disseminated that information

**AMENDED COMPLAINT**

widely.  At times, the information that ICAN disseminates contradicts the government orthodoxy or policy, and that is how ICAN found itself a target in Chairman Schiff's war on disfavored speech.

9.     As the pandemic wore on during an election year, numerous members of Congress applied pressure on Defendants to force those companies to take measures to curb "misinformation" online.  These included concerns specific regarding so called "vaccine misinformation."  Chairman Schiff wrote letters to Defendants decrying their handling of information regarding vaccines.

10.     Despite ICAN having posted on Defendants' platforms for years, soon after Chairman Schiff issued threatening letters concerning vaccine and health information, Defendants changed their policies regarding what they considered misinformation concerning vaccines and public health.  The influence exerted by these government actors is apparent in the policies Defendants implemented. YouTube's policy, for example, prohibits "content about COVID-19 that" they claim, "poses a serious risk of egregious harm," which YouTube defined to include any content that "spreads medical misinformation that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19." Facebook similarly decided to remove content that "leading global health organizations and local health authorities" flagged as contrary to their official statements about COVID-19.   These policies appear virtually tailor made to stifle any criticism of official government policies regarding the pandemic.

11.     As a direct result of these policies, Defendants terminated or greatly restricted ICAN's ability to post information on their networks.  On July 29, 2020, YouTube terminated ICAN's channel, "The HighWire," stating that the content on the channel violated YouTube's Terms of Service ("YouTube's Terms").  This termination was not preceded with any warnings or, as YouTube's Terms refer to them, "strikes."   Similarly, Facebook started by removing several videos from Plaintiffs' Facebook page, "The HighWire with Del Bigtree" and on November 21, 2020, Facebook terminated this page altogether.

**AMENDED COMPLAINT**

12. The loss of these two platforms for ICAN cannot be understated. As the recent anti-trust suit against Facebook brought by the federal government and 48 states demonstrates, Defendants control an enormous percentage of the social media market. If ICAN is prevented from posting on Defendants' websites, it is losing its ability to reach billions of potential viewers.

13. In moving from safeguarding our elections from foreign interference, to limiting information regarding vaccines, Chairman Schiff and other federal officials crossed an important line. They moved from trying to block foreign enemies of the United States from using false information to damage our ability to hold free and fair elections, to trying to stop American citizens from criticizing their own government.

14. Even though Defendants' motivations in succumbing to government pressure may be understandable, their actions cannot be condoned. To allow such actions to proceed will give government actors a powerful tool to limit speech on the most popular form of media today. ICAN now brings this First Amendment action to defend itself against a governmental over-reach, accomplished through coercing Defendants into cooperation. As a result, it seeks injunctive relief to remedy the continuing wrongs committed by Defendants that they have taken to satisfy the demands of Chairman Schiff and others like him in the government.

**PARTIES AND PERSONAL JURISDICTION**

15. Plaintiff, the Informed Action Consent Network ("ICAN"), is a Texas based non-profit with 26 U.S.C. § 513(c)(3) tax-exempt status whose mission is to raise awareness about public health safety and provide the public with accurate information so that citizens may give informed consent regarding related health interventions. As part of its mission, ICAN investigates and disseminates information regarding public health safety issues, including through its website (available at https://www.icandecide.org), postings on social media, press events and releases. Most importantly, ICAN

**AMENDED COMPLAINT**

carries out its activities through a rapidly growing internet-based talk show called "The HighWire with Del Bigtree" (the "HighWire").

16.     ICAN has been instrumental in challenging governmental narratives regarding vaccines and drugs through various successful lawsuits against government agencies such as FDA, HHS, CDC and NIH as well as filing hundreds of FOIA requests to seek additional insight into the decision-making processes of these agencies.  Here are just some examples of ICAN's work:

    i.   In 2018, through FOIA actions, ICAN learned that the HHS, which was supposed to produce biannual reports to Congress regarding vaccine safety, had not produced a single report to Congress.

    ii.  Since then, ICAN has filed hundreds of additional FOIAs seeking to publicize information regarding governmental decisions and actions regarding vaccines and more recently regarding COVID-19.

    iii. Almost all FDA approved vaccines have been licensed based on clinical trials that did not include a placebo control group. https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states (last visited Mar. 29, 2021).  ICAN therefore petitioned the FDA to require that the clinical trials for COVID-19 vaccines include a placebo control group. http://tiny.cc/ao6vtz (last visited Mar. 29, 2021).  Thirteen days after filing this petition, the FDA required that all COVID-19 vaccines trials, which until that point had not included a placebo control group, henceforth include a placebo control group. http://tiny.cc/po6vtz (last visited Mar. 29, 2021).

    iv.  Misinformation regarding vaccines can have serious consequences.  ICAN therefore recently demanded that the NYS Department of Health and Governor Cuomo remove from their campaign regarding COVID-19 vaccines that these vaccines were

7

**AMENDED COMPLAINT**

"approved by the FDA, the CDC, and by NY's independent vaccine panel." https://www.icandecide.org/wp-content/uploads/2021/02/Letter-to-NYSDOH.pdf (last visited Mar. 29, 2021).  ICAN also demanded it take down messaging that stated that "no serious vaccine side effects have been reported."  *Id.*  In response, these false claims were removed by NYS.  http://tiny.cc/mp6vtz (last visited Mar. 29, 2021).

17.    Through its HighWire show, ICAN sheds light on governmental oversight in the area of vaccine and drug development, produces reports from leading experts from the scientific community, disseminates the information it obtains through its legal actions, and solicits donations to fund its charitable activities.

18.    Beginning in 2017, ICAN broadcasted live episodes of The HighWire through a YouTube channel until YouTube terminated ICAN's account.  ICAN also maintained a Facebook page named "The HighWire with Del Bigtree" to broadcast weekly episodes of its show until Facebook terminated that page in November 2020.

19.    Plaintiff Del Bigtree is the executive founder of ICAN and is the host of The HighWire. His Facebook page has over 250,000 followers and a 4.4 out of 5 rating from users.  Mr. Bigtree is one of the most sought-after public speakers in the natural health arena, often gathering audiences in the thousands who travel from around the world to hear his unique blend of passion and scientific expertise. He is a long-time producer and the recipient of multiple awards including an Emmy Award, Best Drama at the New York Television Festival, and the Health Freedom Hero Award from the National Health Freedom Federation, the oldest natural health organization in America.  Mr. Bigtree resides in Austin, Texas.

20.    Defendant YouTube LLC ("YouTube") is a Limited Liability Company incorporated in Delaware with its principal place of business in San Bruno, California.

**AMENDED COMPLAINT**

21.     Defendant Facebook, Inc. ("Facebook") is a corporation incorporated in the state of Delaware with its principal place of business in Menlo Park, California.

22.     In 2017, ICAN created its channel on YouTube and its Facebook page.

## SUBJECT MATTER JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over the present case pursuant to 28 U.S.C. § 1331 (federal question).  This case asserts an actual controversy arising out of continuing violations of the First Amendment.

24.     The venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants transacted a substantial portion of their business in this District that gave rise to Plaintiffs' claim.

## STATEMENT OF MATERIAL FACTS

### A. Congress Grants Social Media Companies Immunity under Section 230 of the Communications Decency Act

25.     In 1996, Congress enacted § 230 of the Communications Decency Act ("**CDA**"). 47 U.C.S. § 230.  This unique provision shields the provider of an "interactive computer service" from liability by stating that such person shall not be "treated as the publisher or speaker of any information provided by another information content provider." 47 U.C.S. § 230(c)(1).  The CDA grants "protection for 'Good Samaritan' blocking and screening of offensive material." 47 U.C.S. § 230(c)(2).  In effect, it grants immunity from civil liability to a provider of interactive computer services for "any action voluntarily taken in good faith to restrict access to or availability of material that [they consider] to be [...] objectionable." 47 U.C.S. § 230(c)(2)(A).  However, 9th Circuit courts have held that this immunity does not apply to a constitutional challenge.

26.     The importance of this provision of law for the survival and continual growth of social media networks such as Defendants' networks cannot be overstated.  This piece of legislation was enacted "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "to preserve the vibrant and competitive free market that presently

9

exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.C.S. § 230(b)(1) and (2).  In the words of Facebook's Head of Security Policy, Nathaniel Gleicher, § 230 is the "shield" that is "absolutely essential for [Facebook] to do [its] work." House Intelligence Committee Hearing, June 2020 (https://www.youtube.com/watch?v=iYrpyCcVnmg) (last visited Dec. 21, 2020).  In the absence of this legislation, social media companies and the internet that we know today could not exist.

27.     In the early 2000s, social media websites and platforms began to facilitate sharing of information, ideas, and other forms of expression.  YouTube, now a wholly-owned Google subsidiary, was founded in 2004 with the same premise: to provide a platform to the public to share information via video clips.  Facebook was also founded in 2004, originally as a platform for students to connect, but later became a global platform with billions of users.

28.     Section 230 enabled social media networks to expand their reach globally at an unprecedented rate without fear that they could be held liable for what their users post.  Millions of people in this country (billions globally) use social media, specifically Facebook and YouTube, on a daily basis to exercise and enjoy their free speech rights.  Facebook and YouTube have become the modern-day equivalent of newspapers, libraries, and the public square.  Their users rely on these platforms to access and to disseminate information.

29.     Upon Google's acquisition of YouTube, YouTube formally defined the four key "values" it is based upon, which include:

- "Freedom of Expression – We believe people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities"

10

**AMENDED COMPLAINT**

- "Freedom of Information – We believe everyone should have easy, open access to information and that video is a powerful force for education, building understanding, and documenting world events, big and small."

*YouTube About Page* (available at https://www.youtube.com/about/) (last visited Dec. 21, 2020).

30.     Facebook started with the mission "to give people the power to build community and bring the world closer together.  People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them." *Facebook Investor Relations, FAQs* (available at https://investor.fb.com/resources/default.aspx) (last visited Dec. 21, 2020)

31.     In order to further these missions, Facebook and YouTube originally had relatively permissive views on free speech and censorship.  As their missions indicated they were focused on the free exchange of ideas, and this led them to a policy that took a light hand to the content their users posted.  While they always retained certain rights to prevent users from using their cites for violations of the company's policies, in practice these were largely limited to true violations of law (e.g., child pornography, copyright violations, or clearly libelous statements).  In social media's new market-place of ideas users lived by the idea that more speech was a good thing and when there was a free flow of ideas good ideas, truthful ideas, would naturally rise.  In fact, YouTube never had anything in its terms of use banning so called "misinformation" until March of 2020 when it added the "COVID Misinformation" category. *See* EXHIBIT A.

**B.  Russian Actors Abuse Social Media to Spread Election Misinformation**

32.     During the 2016 Presidential election, social media platforms including YouTube and Facebook emerged as an extensively used and relied upon political news and information tools.  A Russian intelligence agency called the Internet Research Agency ("IRA") allegedly took advantage of Defendants' platforms to harm the campaign of then Presidential Candidate, Hillary Clinton. *Report On*

*The Investigation Into Russian Interference In The 2016 Presidential Election Vol. I*, Released by the Department of Justice, March 2019 (the "Mueller Report"), (available at https://www.justice.gov/storage/report.pdf) (last visited Dec. 21, 2020).  According to the Mueller Report, the IRA commenced organizing its efforts of sabotaging the 2016 election as early as 2014 with its focus on Facebook, YouTube, and Twitter. *Id.*  The IRA subsequently expanded its operations to include Instagram and Tumblr. *Id.*  The IRA was allegedly responsible for creating fake Facebook profiles purporting to be U.S. persons and fake Facebook groups which falsely claimed to be affiliated with U.S. political organizations. *Id.*  IRA's sabotage campaign also included purchases of false advertisements on Facebook that promoted IRA groups on U.S. residents' newsfeeds, and which endorsed President Trump's presidential campaign. *Id.*

33.    As a result of the social media platforms' failure to contain the illegal abuse of their services, Defendants' businesses faced immense scrutiny from Congress, law enforcement authorities, and the public in the Unites States.  Congress launched multiple investigations to assess the role played by Defendants' platforms in the Russian interference, wherein numerous public and closed hearings were held, some with top executives of Google and Facebook testifying that they had failed to take adequate security measures.  Most of the investigations scrutinized Defendants' systems in order to assess how Defendants could enhance the security and transparency of their platforms to ensure that such foreign involvement and national security breaches do not occur again.

34.    Members of Congress debated enacting legislation to make Defendants' businesses more accountable in case they did not act on their own to contain illegal threats to our democracy.  This included open discussions about legislation that would eliminate the § 230 immunity along with other measures.

35.    Specifically, on June 13, 2019, the House Intelligence Committee, chaired by Chairman Schiff, held a hearing on the risks posed by synthetic media, artificial technologies, and "deepfake"

12

videos (which utilize artificial intelligence to create fake videos that appear to show individuals saying and doing things that those individuals never did or said).  During the Committee's hearing, Chairman Schiff openly challenged the continued appropriateness of § 230 immunity as regards social media networks and stated that "it [was] time [Congress does] away with the immunity so that the platforms are required to maintain a certain standard of care." (https://www.youtube.com/watch?v=tdLS9MlIWOk) (last visited Dec. 21, 2020).  Chairman Schiff also told reporters that, "If the social media companies can't exercise a proper standard of care when it comes to a whole variety of fraudulent or illicit content, then we have to think about whether that immunity still makes sense. These are not nascent industries or companies that are struggling for viability — they're now behemoths, and we need them to act responsibly." (https://www.axios.com/social-media-immunity-section-230-f15ac071-32e9-4e33-81e6-4c7ebadaea5e.html) (last visited Dec. 21, 2020).

36.     The president-elect, Joe Biden, has also openly criticized the § 230 immunity granted to the Social Media Networks.  He asserted that the immunity should be "revoked" for "propagating falsehoods they know to be false." https://www.theverge.com/2020/1/17/21070403/joe-biden-president-election-section-230-communications-decency-act-revoke (last visited Dec. 21, 2020).

37.     The reason Chairman Schiff held the House Intelligence Committee hearings on § 230 of the CDA, and why Vice President Biden spoke out against immunity is crystal clear: the social media companies such as YouTube and Facebook were put on notice by these government officials that unless they stop illegal interference by a foreign country in the American election process, Congress would take legislative action to repeal their cherished immunity under the CDA § 230. *See* https://abcnews.go.com/Politics/adam-schiff-accuses-social-media-companies-misinformation-negligence/story?id=71517306 (last visited Dec. 21, 2020) ("When asked what could be done to prevent social media misinformation and influencing the 2020 election, Chairman Schiff hinted at removing

13

'immunity' granted to social media platforms under Section 230 of the Communications Decency Act.").

38.     It is amply clear that Defendants understand that these officials hold the proverbial Sword of Damocles over the social media companies' heads, and if the companies did not comply with the demands made by the government officials with regard to foreign interference, they would lose the current legal regime that they deem essential to their continued growth.

**C.  Government Actors Coerce Social Media to Censor Protected Speech**

39.     The Government's intervention with Defendants' businesses to curtail election disinformation was justified because that speech was illegal.  As stated in the Mueller Report,

> The United States has a compelling interest . . . in limiting the participation of foreign citizens in activities of democratic self-government, and in thereby preventing foreign influence over the U.S. political process.' *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J., for three-judge court), *aff'd*, 565 U.S. 1104 (2012).  To that end, federal campaign- finance law broadly prohibits foreign nationals from making contributions, donations, expenditures, or other disbursements in connection with federal, state, or local candidate elections, and prohibits anyone from soliciting, accepting, or receiving such contributions or donations.

*Mueller Report* at 184.

40.     With the victory in getting Facebook and YouTube to crack down on illegal interference by Russian agents into American elections, Congressional members leading that charge had found a tool to limit speech.  They discovered that the social media companies had a clear pressure point, Section 230, and that they would bend to any request if they thought that Section 230 was in danger.

41.     However, the Congressional members then decided to take this tool and use it not to compel social media companies to censor *illegal* speech, but rather to compel those social media companies to censor speech that Congressional members disagreed with – speech that was legal and protected by the First Amendment.

14

**AMENDED COMPLAINT**

42.     On February 14, 2019, a year before the COVID-19 pandemic, Chairman Schiff wrote a letter to Mr. Sundar Pichai, Chief Executive Officer of Google, seeking "additional information" on the steps Google was taking to curb vaccine "misinformation."   What Chairman Schiff deemed "misinformation" was not outright falsehoods, but rather any information that questioned the orthodoxy regarding vaccine safety promoted by the federal government's health agencies.  Chairman Schiff stated the following:

> YouTube is surfacing and recommending messages that discourage parents from vaccinating their children, a direct threat to public health … There is strong evidence to suggest that at least part of the source of this trend is the degree to which medically inaccurate information about vaccines surface on the websites where many Americans get their information, among them YouTube … As a Member of Congress who is deeply concerned about declining vaccination rates around the nation, I … encourage further action [] be taken related to vaccine misinformation … As more Americans rely on your services as their primary source of information, it is vital that you take your responsibility with the seriousness it requires.

*Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation* (Feb. 14, 2019) (available at https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation) (last visited Dec. 21, 2020).

43.     On the same day, Chairman Schiff sent a similar letter to Mr. Mark Zuckerberg, Chairman and Chief Executive Officer of Facebook, wherein Chairman Schiff expressed his "concern" that "Facebook accepts paid advertising that contains deliberate misinformation about vaccines." Chairman Schiff urged Facebook to take more active steps to curb vaccine "misinformation" on its platform.  *Schiff Sends Letter to Google, Facebook Regarding Anti-Vaccine Misinformation* (Feb. 14, 2019) (available at https://schiff.house.gov/news/press-releases/schiff-sends-letter-to-google-facebook-regarding-anti-vaccine-misinformation) (last visited Dec. 21, 2020).

15

**AMENDED COMPLAINT**

44.     Chairman Schiff's letters did not reference Section 230 directly, but after the pressure applied following the Russia scandal, he did not need to.  These companies knew what the potential consequences of ignoring these requests could be.  These pressure tactics to compel YouTube and Facebook to censor vaccine related speech were successful.  On February 14, 2019, Facebook told media publishing companies that it would be exploring the removal of "anti-vaccine" information from its from software systems that recommend related content on the site. *See* Sarah Frier, *Facebook, Facing Lawmaker Questions, Says It May Remove Anti-Vaccine Recommendations*, Bloomberg (Feb. 14, 2019) (available at https://www.bloomberg.com/news/articles/2019-02-14/facebook-says-it-may-remove-anti-vaccine-recommendations) (last visited Dec. 21, 2020).  To solidify the new policies, on March 7, 2019, Chairman Schiff revealed in a press release the responses he received to his letters described above:

> "We have put a lot of effort into curbing misinformation in our products – from better Search ranking algorithms, to improving our ability to surface authoritative content, to tougher policies against monetization of harmful or dangerous content. Under YouTube's Advertiser-Friendly Content Guidelines, we are and have been demonetizing anti-vaccination content under our longstanding harmful or dangerous advertising policy," wrote Karan Bhatia, Vice President of Global Public Policy and Government Affairs at Google.

> "Our approach ... is to reduce the spread of inaccurate information about vaccines by reducing its distribution in News Feed, removing groups and pages that promote misinformation from recommendation surfaces, and providing authoritative information to people who might encounter it," wrote Kevin Martin, Vice President of U.S. Public Policy at Facebook.

*Schiff Receives Official Responses from Google, Facebook Regarding Anti-Vaccine Misinformation* (March 7, 2019) (available at https://schiff.house.gov/news/press-releases/schiff-receives-official-responses-from-google-facebook-regarding-anti-vaccine-misinformation) (last visited Dec. 21, 2020).

16

**AMENDED COMPLAINT**

45.     Chairman Schiff also publicly stated on his Twitter account that he had received responses from the social media companies to his February letters and that the "[t]he ultimate test will be if these measures reduce the spread of anti-vaccine content on their platforms, to the benefit of public health." https://twitter.com/RepAdamSchiff/status/1103747416065478657?ref_src=twsrc%5Etfw %7Ctwcamp%5Etweetembed%7Ctwterm%5E1103747416065478657&ref_url=about%3Asrcdoc (last visited Dec. 21, 2020).

46.     On the same day, Facebook Vice President, Global Policy Management, Monika Bickert, issued the following online press release:

> We are working to tackle vaccine misinformation on Facebook by reducing its distribution and *providing people with authoritative information on the topic.* We are starting by taking a series of steps:
>
> We will reduce the ranking of groups and Pages that spread misinformation about vaccinations in News Feed and Search. These groups and Pages will not be included in recommendations or in predictions when you type into Search.
>
> When we find ads that include misinformation about vaccinations, we will reject them. We also remove related targeting options, like "vaccine controversies." For ad accounts that continue to violate our policies, we may take further action, such as disabling the ad account.
>
> We won't show or recommend content that contains misinformation about vaccinations on Instagram Explore or hashtag pages.
> We are exploring ways to share educational information about vaccines when people come across misinformation on this topic.
>
> **Update on April 26, 2019 at 10AM PT:** We may also remove access to our fundraising tools for Pages that spread misinformation about vaccinations on Facebook.
>
> How This Will Work
>
> Leading global health organizations, such as the World Health Organization and the US Centers for Disease Control and Prevention, have publicly identified verifiable vaccine hoaxes. If these vaccine hoaxes appear on Facebook, we will take action against them.
>
> For example, if a group or Page admin posts this vaccine misinformation,

17

**AMENDED COMPLAINT**

we will exclude the entire group or Page from recommendations, reduce these groups and Pages' distribution in News Feed and Search, and reject ads with this misinformation.

We also believe in providing people with additional context so they can decide whether to read, share, or engage in conversations about information they see on Facebook. We are exploring ways to give people more accurate information from expert organizations about vaccines at the top of results for related searches, on Pages discussing the topic, and on invitations to join groups about the topic. We will have an update on this soon.

We are fully committed to the safety of our community and will continue to expand on this work.

*Combatting Vaccine Misinformation*, FACEBOOK, available at (https://about.fb.com/news/2019/03combatting-vaccine-misinformation) (last visited Dec. 21, 2020) (emphasis added).

47.     Chairman Schiff's pressure tactics did not end with "encouraging" Facebook and YouTube to "curb vaccine misinformation" on the internet.  With the coronavirus pandemic rapidly spreading in the United States, on April 29, 2020, after his previous letter to key YouTube and Facebook executives, Chairman Schiff once again applied governmental pressure and wrote to the social media companies, this time expanding his censorship of "vaccine misinformation" to also include "coronavirus misinformation."  Chairman Schiff's letter reminded the platforms that the best practice is to "remove or [downgrade] all harmful content before users engage with it" and urged them to adopt policies similar to that of Facebook to tackle coronavirus misinformation.  *Schiff Urges Google, YouTube, Twitter to Inform Users Who Interact With Coronavirus Misinformation* (April 30, 2020) (available at https://schiff.house.gov/news/press-releases/schiff-urges-google-youtube-twitter-to-inform-users_who-interact-with-coronavirus-misinformation) (last visited Dec. 21, 2020).

48.     Thus, now in the name of his view of public health, Chairman Schiff pushed the boundary further to silence speech concerning one of the largest and most important public issues of the last decade.  At the time, the COVID-19 pandemic was in its early phase.  There was no clear scientific

18

consensus on every aspect of the virus and the government's response.  In fact, it was a hot-button political issue as well with Democrats and Republicans viewing the issue differently.  These are precisely the kinds of public debates that the First Amendment was designed to foster, where policy makers and the public are groping to understand an issue and all sides must be heard to ensure that good decisions can be made based on all the facts and opinions.

49.      Again, Chairman Schiff's pressure worked, and he was able to use Defendants as his tool to stifle opinions and information he disagreed with.  After Chairman Schiff's April 29th letter, YouTube CEO, Susan Wojcicki, responded explaining YouTube's coronavirus "misinformation" policies:

> We also partner closely with researchers and elected officials from around the world to better understand the challenges of online misinformation and take their recommendations for improvement seriously. *We are committed to working with Members of Congress* as well as health experts around the world to better understand these challenges as we continue developing robust policy and product improvements that help keep people safe. I hope you will continue to share with me your views about our work.

*Schiff Receives Responses from YouTube and Twitter Regarding Coronavirus Misinformation* (May 28, 2020) (available at https://schiff.house.gov/news/press-releases/schiff-receives-responses-from-youtube-and-twitter-regarding-coronavirus-misinformation) (last visited Dec. 21, 2020).

50.      In fact, Politico reported that Chairman Schiff is continually engaged "directly with the companies" on the issue of vaccine misinformation. https://www.politico.com/news/2020/12/21/social-media-vaccine-misinformation-449770 (last visited Mar. 29, 2021).

51.      The looming threat of removing Section 230 immunity, first wielded for an acceptable purpose of compelling social media companies to prevent *illegal* actions was now being wielded to compel social media companies to censor *legal and protected* speech with which certain government officials disagreed.

19

**AMENDED COMPLAINT**

**D.  Government Officials Have Exerted Continuous Pressure on Defendants**

52.      Chairman Schiff is not the only government official who has threatened Defendants. Other federal officers have made public statements demonstrating the continuous coercion exerted by Congress on Defendants.

53.      To illustrate, in April 2019, Representative from New York and the Chairman of the House Judiciary Committee, Jerrold Nadler also openly spoke about the Congressional "pressure" on the tech giants.  He expressed his concerns over direct regulation of social media censorship by law and said, "Let's see what happens by just pressuring them first."  https://www.washingtonpost.com/news/ powerpost/paloma/the-technology-202/2019/04/09/the-technology-202-lawmakers-plan-to-ratchet-up- pressure-on-tech-companies-content-moderation-practices/5cabee50a7a0a475985bd372/  (last visited Mar. 23, 2021).

54.      Around the same time, Rep. Cedric Richmond from Louisiana told Defendants to restrict content lest they face increased Congressional regulation.  He said "We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable."  https:// www.washingtonpost.com/news/powerpost/paloma/the-technology-202/2019/04/09/the-technology- 202-lawmakers-plan-to-ratchet-up-pressure-on-tech-companies-content-moderation-practices/ 5cabee50a7a0a475985bd372/ (last visited Mar. 23, 2021).

55.      Additionally, various Congressional Committees have been working relentlessly to address issues concerning "misinformation" on social media, frequently suggesting, but each time stopping short of actually amending Section 230, imposing new regulations, or breaking up Facebook (as some members of Congress have suggested).  This is because the Members of Congress know that they cannot enact litigation to curtain speech they dislike, but can operate by pressurizing Defendants to do their bidding.

**AMENDED COMPLAINT**

56.     These pressure tactics continued through 2019 and into 2020 on a variety of topics.  In September 2019, Roll Call ran a headline: "Facebook, other social media sites pressured to protect census," and went on to describe how "Members of Congress are pushing social media companies like Facebook to protect the census from disinformation."  https:// www.rollcall.com/2019/11/08/facebook-other-social-media-sites-pressured-to-protect-census/ (last visited Mar. 29, 2021).  This headline came after Members of Congress had written letters to Defendants "recommending" the action Defendants should take to curb census misinformation.  https:// www.schatz.senate.gov/imo/media/doc/Census%20Misinformation%20Letters%2007.15.19.pdf  (last visited Mar. 29, 2021).

57.     These pressure tactics appear to have worked.  Shortly thereafter, Defendants updated their polices surrounding census misinformation.  *See Vinita Gupta's, CEO of The Leadership Conference on Civil and Human Rights, testimony before the House Committee on Oversight and Reform* (available at https:// oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/Gupta%20Testimony.pdf) (last visited Mar. 29, 2021) ("Pressured by […] Congress tech companies and online social media platforms have started to commit to fight disinformation and misinformation that prey on people's fears, but strong enforcement of those policies by the platforms will be critical.")

58.     During hearings in October 2019, in front of the Financial Services Committee, "Representative Maxine Waters, the panel's fiery Democratic chair, quizzed Zuckerberg on Facebook's steps to combat misinformation and voter suppression ahead of the November 2020 U.S. presidential election. She also suggested policymakers should consider breaking up Facebook" according to Reuters New Service.  https://www.reuters.com/article/us-facebook-congress/facebooks-zuckerberg-grilled-in-u-s-congress-on-digital-currency-privacy-elections-idUSKBN1X2167 (last visited Mar. 29, 2021).

**AMENDED COMPLAINT**

**E.  Defendants Enact Policies that Prohibit Criticism of the Government's Policies Regarding COVID-19**

59.    These various pressure campaigns were successful in forcing Defendants to make changes. Unsurprisingly, given the direct influence exerted by government officials like Chairman Schiff, YouTube, and Facebook's determinations of what is considered "misinformation" is based exclusively on what the government and governmental related authorities tell them to allow.  In short, Defendants perceive "vaccine misinformation" or "coronavirus misinformation" as anything that contradicts government policy.  They claim to rely on governmental and supra-governmental authorities such as the CDC and the WHO to determine which medical information concerning vaccines or the coronavirus pandemic is "misinformation."

60.    YouTube's policy, for example, prohibits "content about COVID-19 that . . . spreads medical misinformation that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19."   (available at https://support.google.com/youtube/answer/9891785?hl=en) (last visited Mar. 29, 2021).  Facebook similarly says that it removes content that has "been flagged by leading global health organizations and local health authorities that could cause harm to people who believe them."  https://about.fb.com/news/2020/12/coronavirus/ (last visited Mar. 29, 2021).

61.    Furthermore, in fact checking postings, the companies use information supplied by these organizations as authoritative and established facts and, in turn, serve as the arbiters of truths. *See Facebook Update, Keeping People Safe and Informed About the Coronavirus* ("In several countries we are directing people to their local ministry of health. For example, in the US we are directing people to information from the Centers for Disease Control and Prevention (CDC))" (available at https://about.fb.com/news/2020/10/coronavirus/) (last visited Dec. 21, 2020); *YouTube COVID-19 Medical Misinformation Policy* ("YouTube doesn't allow content that spreads medical misinformation that

**AMENDED COMPLAINT**

contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19.") (available at https://support.google.com/youtube/answer/9891785?hl=en&hl=en&ref_topic=9282436) (last visited Dec. 21, 2020).  In effect, this made the CDC and WHO similar to the Ministry of Truth,[2] defining what the official truth was for the masses, and any information that runs contrary to their word is suppressed by the governments' agents in YouTube and Facebook.

62.     Criticizing the government is a core function of the free press in a democracy; it is how we ensure truth and honesty from the government.  Contrary to Defendants' core values or mission statements, their policies, enacted at Chairman Schiff's request and in the face of pressure from others in government, fail to recognize that members of the public are entitled to differ from the CDC or the WHO in their views and express those different views.  Critically, different than tackling false information or hoaxes, Defendants' broad construction of the phrase "misinformation" – to include anything they deem "anti-vaccine" regardless of its veracity – at the behest of Chairman Schiff and his congressional colleagues impinges upon the free speech rights of Plaintiffs.

63.     YouTube's Terms and Community Guidelines (a set of rules in addition to the Terms of Service which permits users to ascertain what content is allowed and what content is disallowed from the website) ("YouTube's Community Guidelines") provide for a "three strike" system. (https://support.google.com/youtube/answer/2802032?hl=en&ref_topic=9387060) (last visited Dec. 21, 2020). If a user violates YouTube's policies, YouTube issues strikes to warn the user of the breach of terms. *Id.*  Upon receiving three strikes, YouTube reserves the right to terminate the services of the user, while the user reserves the right to appeal all of YouTube's decisions. *Id.*

---

[2] *See* Ministry of Truth, Ministries of *Nineteen Eighty-Four*, Wikipedia, https://en.wikipedia.org/wiki/Ministries_of_Nineteen_Eighty-Four#Ministry_of_Truth (Last visited December 21, 2020).

**AMENDED COMPLAINT**

64.     On or about March 20, 2020, YouTube updated its Community Guidelines to include policies specifically targeting some coronavirus information. (https://support.google.com/youtube/answer/9891785) (last visited Dec. 21, 2020).  Accordingly, "[i]f [a user's] content violates this policy, [YouTube will] remove the content." *Id.*  However, in response to the COVID-19 pandemic, YouTube suspended the three strikes system for removed content "unless YouTube's systems have high confidence that it violates [their] policies." (https://www.youtube.com/watch?v=i352PxWf_3M&feature=youtu.be) (last visited Dec. 21, 2020).  This policy allegedly allowed content providers – or at least certain content providers – to upload videos "without worrying about hitting three strikes" which would result in a permanent account termination.

65.     Much like YouTube, Facebook also updated its "misinformation" policies in April 2020, contained in its Community Standards (a set of rules in addition to the Terms of Service which permits users to ascertain what content is allowed and what content is disallowed from the website) ("Facebook's Community Standards") to specifically tackle coronavirus misinformation.  As part of these new policies, Facebook claimed that it partnered with more fact checkers to increase its fact checking capabilities. https://about.fb.com/news/2020/04/covid-19-misinfo-update/ (last visited Dec. 21, 2020). These fact checkers were also paid by Facebook. *Id.*  Facebook further stated that "once a piece of content is rated false by fact-checkers, [it] reduce[s] its distribution and show[s] warning labels with more context." *Id.*

66.     To reaffirm its stance, Facebook adopted another policy in October 2020 whereby it prohibited ads that discouraged vaccines. *See* https://about.fb.com/news/2020/10/supporting-public-health-experts-vaccine-efforts/ (last visited Dec. 21, 2020).  However, even in this policy, Facebook did not adopt an outright ban on "anti-vaccine" content or groups.

1

**F.  YouTube Shuts Down The HighWire's Page Without Warning**

2
3
4
5
6
7
8
9
10

67.     In 2017, ICAN started the internet talk-show The HighWire to disseminate the latest medical news and information in the area of human health and to provide a platform for scientists and experts to debate and express their opinions.  In order to broadcast the show, ICAN created a YouTube channel in 2017 by executing the website's terms of service.  From 2017 through July 2020, ICAN maintained its YouTube channel by broadcasting a new live video every Thursday.  ICAN also actively used The HighWire episodes to solicit donations from its viewers to raise funds to carry out its not-for-profit operations.  The HighWire's popularity was increasing rapidly and by 2020 ICAN's YouTube page boasted over 250,000 subscribers worldwide.

11
12
13
14
15

68.     ICAN always abided by YouTube's Terms of Service and YouTube's Community Guidelines.  Given its importance in disseminating information, ICAN valued its YouTube Channel.  Thus, prior to July 2020, when Chairman Schiff sent his letter, ICAN never received a single complaint or "strike" from YouTube regarding any of its videos.

16
17
18
19
20
21
22
23
24
25
26

69.     Despite its policy change to its "three strike" system, on July 3, 2020, YouTube commenced its systematic attack against Plaintiffs' channel, The HighWire.  YouTube took down a video featuring a doctor discussing hydroxychloroquine, stating that this video violated YouTube's community guidelines.  However, YouTube informed The HighWire that this removal "ha[d] not" resulted in a strike against the channel.  Over the following four weeks, YouTube took down seven other videos on The HighWire, each time notifying The HighWire that the removals "ha[d] not" resulted in a strike against the channel.  Yet, on Wednesday, July 29, 2020, YouTube terminated Plaintiffs' channel "The HighWire" without any warnings, alleging that "the activity in [The HighWire's] account violates [YouTube's] terms of service."  All notifications received by Plaintiffs from YouTube are attached as EXHIBIT B.

27
28

25

**AMENDED COMPLAINT**

70.     This abrupt and unexpected termination caused ICAN to lose all of its 250,000 subscribers who regularly watched the weekly episodes.  The termination also left ICAN with less than 24 hours to find alternative avenues to broadcast the next episode of its show on July 30, 2020.  ICAN further lost all its historical analytical data and videos uploaded on YouTube since 2017.  ICAN and its viewers were effectively locked out of viewing any content it had ever uploaded on YouTube and all data associated with such content.  Since the termination, ICAN has had to raise and expend thousands of dollars to get its own website up and running and re-upload all the previous episodes and other educational materials it routinely provides its viewers.  The termination not only impacted ICAN, but other medical professionals as well who appeared on the show and used ICAN's YouTube links on their own individual websites and social media to help disseminate educational materials.

71.     ICAN followed YouTube's appeals mechanisms to no avail.

**G. Facebook Takes Down ICAN's Videos and Then Shuts Down The HighWire's Page Without Warning**

72.     ICAN maintains two pages on Facebook, one under the name of "Informed Action Consent Network" and the other "The HighWire with Del Bigtree" ("ICAN's Facebook Pages").  ICAN used The HighWire page for the same purposes it used the YouTube channel prior to its termination, that is, to make available weekly episodes of The HighWire for its viewers.  The HighWire Facebook page had a following of over 360,000 users with over 30 million views on its videos.

73.     On or about July 7, 2020, Facebook took down one of The HighWire's videos from its page stating that, "[the] post goes against [Facebook's] Community Standards on misinformation that can cause physical harm."  Several videos were removed thereafter with similar vague explanations from Facebook.

74.     On November 21, 2020, Facebook joined YouTube in de-platforming ICAN by "unpublishing" The HighWire Facebook page.  This purge was not preceded by any warning, nor was

**AMENDED COMPLAINT**

1   it supported by adequate reasoning by specification of a particular violation.  All notifications received

2   from Facebook are attached as EXHIBIT C.

3       75.    ICAN always abided by Facebook's Terms of Service and Facebook's Community

4   Standards.  Given its importance in disseminating information, ICAN valued its Facebook page.  Thus,

5   prior to July 2020, ICAN never received a single complaint from Facebook regarding any of its videos.

6       76.    Facebook's actions have caused ICAN to lose its 360,000 followers on Facebook and all

7   its analytical data pertaining to all videos uploaded since 2017.  Facebook's actions have severely

8   curtailed ICAN's ability to reach its followers and raise funds to carry out its charitable mission.

9       77.    It is apparent that YouTube and Facebook took the actions of removing The HighWire's

10  videos from their platforms after succumbing to the pressure created by certain governmental officials

11  abusing their authority.  YouTube and Facebook arguably have some rights to moderate content on their

12  platforms, however, in the present case, the actions taken by Defendants are illegal because they came

13  as the result of governmental pressure on the companies.  Such actions, therefore, violated Plaintiffs'

14  First Amendment rights.

15      78.    Before this pressure was applied, Defendants had never removed ICAN's content.  On

16  information and belief, in the absence of governmental pressure, Defendants would not have purged The

17  HighWire's platforms.  Indeed, on July 27, 2020, a video made by several practicing doctors treating

18  COVID-19 patients began circulating on YouTube and Facebook.  Facebook let the video circulate for

19  five hours before it was removed, during which time the video had over 20 million views and received

20  100 thousand comments.  Similarly, YouTube took the video down only after it had already reached

21  over 200,000 views.  Facebook and YouTube clearly saw a business incentive in leaving the video up

22  for some time although it allegedly violated the Companies' Community Standards, Terms of Service,

23  and Misinformation Policies.

**AMENDED COMPLAINT**

**H.  Government Officials Call Out Defendants for Violating the First Amendment**

79.    On May 28, 2020, President Trump – obviously taking issue with improper censorship – introduced an executive order seeking clarifications as to the scope of immunity under § 230 of the CDA.  https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/ (last visited Dec. 21, 2020).  The President said the social media companies "have had unchecked power to censor, restrict, edit, shape, hide, alter any form of communication between private citizens or large public audiences…We are fed up with it."  President Trump further said he was taking the action to "defend free speech from one of the gravest dangers it has faced in American history."  https://www.msn.com/en-us/news/politics/coronavirus-government-response-updates-trump-gives-first-reaction-to-100000-deaths/ar-BB14IudM (last visited Dec. 21, 2020).

80.    Other politicians who have not agreed with the censorship occurring, unlike Chairman Schiff and his congressional colleagues, have recognized and called out Defendants' incessant censorship of differing views as unconstitutional.   In the July 29, 2020 Antitrust Sub-Committee Hearing, Reps. Jim Sensenbrenner, Greg Steube, and Jim Jordan recognized that Social Media Networks have been baselessly censoring views and taking advantage of the immunity § 230 of the CDA provides. https://www.youtube.com/watch?v=WBFDQvIrWYM&t=15783s (last visited Dec. 21, 2020).

81.    The Department of Justice ("**DOJ**") has also identified four "ripe" areas for reforms to § 230 of the CDA.  (https://www.justice.gov/ag/department-justice-s-review-section-230-communications-decency-act-1996?utm_medium=email&utm_source=govdelivery) (last visited Dec. 21, 2020).  One of those areas is "promoting open discourse and greater transparency."  *Id.*  The DOJ recommends that "the vague catch-all 'otherwise objectionable' language in § 230(c)(2) [should be replaced] with 'unlawful' and 'promotes terrorism.'"  *Id.*  The objective of "[t]his reform [is to] focus the broad blanket immunity for content moderation decisions on the core objective of Section 230—to reduce online content harmful to children—while limiting a platform's ability to remove content

28

arbitrarily or in ways inconsistent with its terms or service simply by deeming it 'objectionable.'" *Id.* Second, the DOJ

> "proposes adding a statutory definition of 'good faith,' which would limit immunity for content moderation decisions to those done in accordance with plain and particular terms of service and accompanied by a reasonable explanation, unless such notice would impede law enforcement or risk imminent harm to others. Clarifying the meaning of 'good faith' should encourage platforms to be more transparent and accountable to their users, rather than hide behind blanket Section 230 protections."

*Id.*

82.    Public statements by government officials, such as those above, exhibit how deeply the government has meddled into what should have been purely private action.  Indirect state action can further be gauged from Congress's hesitation in passing a law regulating online content moderation. Numerous bills have been presented in Congress, and continue to be presented, proposing amendments to section 230, or suggesting other regulations be imposed on social media companies, but none have so far succeeded.  It appears that Members of Congress prefer to act indirectly by threatening and coercing Defendants into submission, rather than risking First Amendment issues by directly regulating content.

83.    Even though Defendants are private companies, they saw no need to limit Plaintiffs' speech.  It was not until after multiple members of Congress started to apply pressure to Defendants that they changed their policies and began to punish Plaintiffs for their speech criticizing the government. In this context, Defendants actions must be seen as taken under duress, and therefore can no longer be deemed purely private.

84.    Defendants market their online platforms as public forums intended to protect free speech and spheres where people can exchange ideas and express their views and opinions freely.  According to YouTube, "voices matter" and YouTube is "committed to fostering a community where everyone's voice can be heard."  Similarly, Facebook views itself as a virtual sphere where people can "talk openly

29

**AMENDED COMPLAINT**

about the issues that matter to them, even if some may disagree or find them objectionable." Yet, they have bent to government officials to censor views these government officials do not agree with.

**CLAIM FOR RELIEF**

**FIRST AMENDMENT OF THE U.S. CONSTITUTION – *BIVENS* VIOLATIONS**

**Against Defendants YouTube and Facebook**

85.     Plaintiffs restate and reallege paragraphs 1-71 of this Complaint and incorporate them herein by reference.

86.     Plaintiffs have brought this private damage action to seek redress for violation of their First Amendment rights under *Bivens*. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 402 U.S. 388 (1971) (holding that there exists an implied private damage remedy against state agents acting under the color of law for violating the Fourth Amendment rights of the plaintiff).

87.     Plaintiffs' videos on their YouTube channel and Facebook pages were designed to educate and disseminate medically relevant information to the American public and were thus, constitutionally protected speech under the First Amendment.   Plaintiffs' videos also presented points of view that differed from established government policies and practices and, as such, were protected by the First Amendment as criticism of the government.

88.     Governmental actors misused the power of their position and coerced private entities to do their bidding.  Defendants' businesses are premised on making things go viral in order to reach maximum viewers, and then selling advertising to those viewers.  As a result, Defendants have little economic incentive to engage in censorship of content that the public finds appealing, because doing so runs contrary to their economic interests.  In fact, before Defendants started receiving pressure from government actors in 2019 and 2020, neither Defendants almost ever objected to Plaintiffs' postings.. When viewed in light of this history and Defendants' business models, it is clear that Defendants would

30

**AMENDED COMPLAINT**

not have taken the decision to censor Plaintiffs' protected speech absent coercion or significant encouragement from key government officers.

89.     Defendants, thus, should be treated as state actors because they acted based on the encouragement, coercion, and/or threats of powerful government officials.

90.     Defendants' restriction of Plaintiffs' speech is both content and viewpoint based since Defendants are targeting vaccine related speech and seek to suppress viewpoints the government officials they serve do not agree with, in violation of the First Amendment.

91.     The publicly available information stated above shows the existence of interdependence between Chairman Schiff and the Defendants.   It also reflects the persistent coercion by other government officials.

92.     The government coercion when coupled with immunity from liability under Section 230 is sufficient to trigger the Constitutional restrictions under Supreme Court precedent to convert Defendants' private action into state action.

93.     YouTube and Facebook willfully participated with Chairman Schiff and other government officials, including public health authorities such as the CDC, to frame their policies surrounding so called "vaccine misinformation" or "coronavirus misinformation" and to take the action of censoring Plaintiffs' content on Defendants' platforms.   Any further information that may be relevant to sufficiently prove the existence of such interdependence is within the private control of Defendants, and which can only be revealed through discovery.

94.     Plaintiffs have suffered and continue to suffer an immediate and irreparable injury as a direct and proximate result of Defendants' arbitrary and capricious actions.   Plaintiffs' injuries include loss of revenue, loss of viewership, damage to Plaintiffs' goodwill and reputation, for which there exists no adequate remedy at law.

**AMENDED COMPLAINT**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to enter Judgment against YouTube and Facebook as follows:

1.      An order directing YouTube to restore ICAN's YouTube channel to the state it was on July 29, 2020;

2.      An order directing Facebook to restore ICAN's and The HighWire's Facebook Page to the state they were in on July 7, 2020;

3.      An order enjoining Defendants from restricting Plaintiffs' speech as set forth in this Complaint;

4.      An award for Plaintiffs' reasonable attorney fees, costs and expenses; and

5.      Such other and further relief as this Court should find just and proper

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.


Dated:  March 29, 2021


*/s/ Elizabeth Brehm*
Aaron Siri (*Pro Hac Vice*)
Email: aaron@sirillp.com
Elizabeth A. Brehm (*Pro Hac Vice*)
Email: ebrehm@sirillp.com
SIRI & GLIMSTAD LLP
200 Park Avenue
17th Floor
New York, NY 10166
Telephone:  212-532-1091

**AMENDED COMPLAINT**

Sam M. Muriella (SBN 132284)
Email: sammuriella@yahoo.com
111 Pacifica
Suite 140
Irvine, CA 92618
Telephone: 949-412-3586

*Attorneys for Plaintiffs*

**AMENDED COMPLAINT**