SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

ARI HOLTZBLATT (*pro hac vice*)
Ari.Holtzblatt@wilmerhale.com
MOLLY M. JENNINGS (*pro hac vice*)
Molly.Jennings@wilmerhale.com
AMY LISHINSKI (*pro hac vice*)
Amy.Lishinski@wilmerhale.com
SPENCER TODD (*pro hac vice*)
Spencer.Todd@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Defendant*
FACEBOOK, INC.

LAUREN GALLO WHITE (SBN 309075)
lwhite@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105-1126
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

BRIAN M. WILLEN (*pro hac vice*)
bwillen@wsgr.com
BENJAMIN D. MARGO (*pro hac vice*)
bmargo@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019-5800
Telephone: (212) 999-2000
Facsimile: (212) 999-5801

BECCA E. DAVIS (SBN 322765)
becca.davis@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071-2027
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

*Attorneys for Defendant*
YOUTUBE, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| THE INFORMED CONSENT ACTION NETWORK and DEL BIGTREE,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE LLC and FACEBOOK, INC.,<br><br>Defendants. | CASE NO.: 4:20-cv-09456-JST<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hon. Jon S. Tigar<br>Courtroom 6 – 2nd floor<br>Date: May 27, 2021<br>Time: 2:00 p.m. |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS .................................................. 1

STATEMENT OF REQUESTED RELIEF ............................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

BACKGROUND .................................................................................................. 3

    A.    YouTube, Facebook, And Their Content Policies ................................... 3

        1.    YouTube's Terms of Service and Rules Against Medical Misinformation ................................................................................. 3

        2.    Facebook's Terms of Service and Rules Against Medical Misinformation ................................................................................. 4

    B.    Informed Consent Action Network ........................................................ 5

        1.    Plaintiffs' Videos on YouTube and Facebook ........................... 5

        2.    Plaintiffs' Allegations About Members of Congress ................. 7

ARGUMENT ...................................................................................................... 9

I.    PLAINTIFFS CANNOT STATE A *BIVENS* CLAIM FOR VIOLATION OF THE FIRST AMENDMENT ..................................................................................... 9

    A.    Facebook And YouTube Are Private Parties, Not State Actors ............. 9

    B.    The Government-Compulsion Theory Creates No Basis For Holding Private Entities Liable As State Actors ................................................ 10

    C.    Plaintiffs' Allegations That Members of Congress Pressured Defendants Does Not Create A Viable Basis For State Action ................................ 11

    D.    The *Bivens* Implied Right of Action Does Not Apply To Claims Against Private Corporations ........................................................................... 16

II.    THE FIRST AMENDMENT INDEPENDENTLY BARS PLAINTIFFS' *BIVENS* CLAIM ......................................................................................................... 18

CONCLUSION .................................................................................................. 19

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abu-Jamal v. Nat'l Pub. Radio*,
    1997 WL 527349 (D.D.C. Aug. 21, 1997)...........................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................................9, 16

*Ass'n of American Physicians & Surgeons v. Schiff*,
    2021 WL 354174 (D.D.C. Feb. 2, 2021)...........................................................................15

*Assocs. & Aldrich Co. v. Times Mirror Co.*,
    440 F.2d 133 (9th Cir. 1971).............................................................................................19

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ...........................................................................................................9

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ...........................................................................................10, 11, 12

*Carlson v. Green*,
    446 U.S. 14 (1980) ...........................................................................................................17

*Coltrain v. Shewalter*,
    66 Cal. App. 4th 94 ............................................................................................................9

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) .....................................................................................................17, 18

*Daniels v. Alphabet, Inc.*,
    2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ......................................................... *passim*

*Davison v. Facebook, Inc.*,
    370 F. Supp. 3d 621 (E.D. Va. 2019).................................................................................10

*Ebeid v. Facebook, Inc.*,
    2019 WL 2059662 (N.D. Cal. May 9, 2019) ......................................................................10

*Fayer v. Vaughn*,
    649 F.3d 1061 (9th Cir. 2011)..............................................................................................9

*FDIC v. Meyer*,
    510 U. S. 471 (1994) .........................................................................................................17

*Fed. Agency of News, LLC v. Facebook, Inc.*,
    395 F. Supp. 3d 1295 (N.D. Cal. 2020) .............................................................................10

*Fehrenbach v. Zeldin*,
    2018 WL 4242452 (E.D.N.Y. Aug. 6, 2018) ......................................................................10

*First Nat'l Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ....................................................................................................... 3

*Forbes v. Facebook, Inc.,*
    2016 WL 676396 (E.D.N.Y. Feb. 18, 2016) ................................................................ 10

*Franklin v. Fox,*
    312 F.3d 423 (9th Cir. 2002) ....................................................................................... 16

*Freedom Watch, Inc. v. Google, Inc.,*
    368 F. Supp. 3d 30 (D.D.C. 2019) ............................................................................... 10

*Green v. Youtube, LLC,*
    2019 WL 1428890 (D.N.H. Mar. 13, 2019) ................................................................ 10

*Heineke v. Santa Clara Univ.,*
    965 F.3d 1009 (9th Cir. 2020) ..................................................................................... 12

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ................................................................................................... 17

*Howard v. AOL,*
    208 F.3d 741 (9th Cir. 2000) ....................................................................................... 10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ..................................................................................................... 19

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) ....................................................................................... 9

*Johnson v. Knowles,*
    113 F.3d 1114 (9th Cir. 1997) ..................................................................................... 12

*Kim v. Apple, Inc.,*
    2014 WL 3056136 (D.D.C. July 7, 2014) ................................................................... 10

*Kinderstart.com, LLC v. Google, Inc.,*
    2007 WL 831806 (N.D. Cal. Mar. 16, 2007) .............................................................. 10

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) .................................................................................. 3, 6

*La Tiejira v. Facebook, Inc.,*
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ......................................................................... 19

*Langdon v. Google, Inc.,*
    474 F. Supp. 2d 622 (D. Del. 2007) ............................................................................ 19

*Manhattan Cmty. Access Corp. v. Halleck,*
    139 S. Ct. 1921 (2019) ...................................................................................... 9, 15, 16

*Martinez v. GEO Grp., Inc.*,
  2020 WL 2496063 (C.D. Cal. Jan. 7, 2020)..........................................................................17

*Mathis v. Pac. Gas & Elec. Co.*,
  75 F.3d 498 (9th Cir. 1996) .........................................................................................15, 16

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ...........................................................................................................19

*Mireskandari v. Daily Mail & General Trust PLC*,
  2013 WL 12129944 (C.D. Cal. Jan. 14, 2013).....................................................................16

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ...........................................................................................................19

*Nyabwa v. FaceBook*,
  2018 WL 585467 (S.D. Tex. Jan. 26, 2018) ........................................................................10

*Prager Univ. v. Google LLC*,
  951 F.3d 991 (9th Cir. 2020)...........................................................................................1, 10

*Quigley v. Yelp, Inc.*,
  2018 WL 7204066 (N.D. Cal. Jan. 22, 2018) ......................................................................10

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ...........................................................................................................19

*Rutenburg v. Twitter, Inc.*,
  2021 U.S. Dist. LEXIS 27539 (N.D. Cal. Feb. 11, 2021).....................................................10

*Search King Inc. v. Google Tech., Inc.*,
  2003 WL 21464568 (W.D. Okla. May 27, 2003) .................................................................19

*Shulman v. Facebook.com*,
  2017 WL 5129885 (D.N.J. Nov. 6, 2017) ............................................................................10

*Sutton v. Providence St. Joseph Med, Ctr.*,
  192 F.3d 826 (9th Cir. 1999).........................................................................................10, 11

*Young v. Facebook, Inc.*,
  2010 WL 4269304 (N.D. Cal. Oct. 25, 2010) ......................................................................10

*Zhang v. Baidu.com, Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014)....................................................................................19

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ..................................................................................................17, 18

**STATUTES, RULES, AND REGULATIONS**

U.S. Const. Amend. I ................................................................................................ *passim*

Cal. Civ. Proc. Code § 425.16 ................................................................................. 8

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, on May 27, 2021, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 6 of the United States District Court for the Northern District of California, Oakland Division, this Motion to Dismiss will be heard. Facebook, Inc. and YouTube, LLC move to dismiss the First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). This Motion to Dismiss is based on this Notice of Motion and the Memorandum of Points and Authorities.

## STATEMENT OF REQUESTED RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Facebook and YouTube request that the Court dismiss the FAC with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs The Informed Consent Action Network and Del Bigtree (collectively, "Plaintiffs") claim that Defendants YouTube LLC ("YouTube") and Facebook, Inc. ("Facebook") violated the First Amendment when they removed Plaintiffs' content and suspended their accounts. This claim fails as a matter of law and in fact inverts the relevant First Amendment protections.

The videos that Plaintiffs posted on YouTube and Facebook repeatedly asserted that wearing a mask interferes with the development of children's brains, belittled people who abide by government-imposed quarantine, and actively encouraged viewers to contract COVID-19. While they reached their decisions independently, both YouTube and Facebook expressly prohibit such misleading health content. In an effort to turn Defendants' editorial decisions into a literal federal case, Plaintiffs advance a cause of action under *Bivens*, asserting that Defendants violated the First Amendment by applying their rules to removing this material. Plaintiffs' claim runs headlong into an unbroken series of cases—including the Ninth Circuit's controlling decision in *Prager University v. Google LLC*, 951 F.3d 991 (9th Cir. 2020)—holding that private online platforms are not state actors.

Trying to evade this authority, Plaintiffs focus on a handful of individual members of the House of Representatives and "various Congressional committees," who Plaintiffs claim used

Defendants as "cats paw[s]" to censor Plaintiffs' speech. Plaintiffs' theory is that because members of Congress expressed concern about the spread of online health-related misinformation, Defendants' decisions to remove such material from their private property were somehow transformed into government censorship. That is not the law. Private companies are not constitutionally disabled from combatting what they consider to be harmful content on their platforms merely because certain members of Congress have offered similar views. *See, e.g.*, *Daniels v. Alphabet Inc*., 2021 WL 1222166, at *3 (N.D. Cal., Mar. 31, 2021) (DeMarchi, J.) (dismissing virtually identical First Amendment claim against Google and YouTube based on theory that "Congressional representatives coerced defendants into taking action to remove content from the YouTube platform"). Beyond that, Plaintiffs have no right to sue Defendants under *Bivens*: that cause of action allows claims only against *individual federal officials*; it does not apply to claims against private corporations.

In addition to failing on its own terms, Plaintiffs' *Bivens* claim is barred by the First Amendment, which protects Defendants' right to decide not to allow harmful misinformation on their platforms and bars Plaintiffs from attempting to use this Court to override Defendants' exercise of editorial discretion.

None of these defects can be cured by further amendment. Prior to moving to dismiss Plaintiffs' initial complaint, Defendants identified each defect in a letter urging Plaintiffs to drop this lawsuit or, if they believe these defects could somehow be cured, to come forward with proposed amendments that would address them. *See* White Ex. 1.[1] Plaintiffs chose to stand on their original Complaint, stating that "[t]he complaint itself provides more than an adequate and good faith basis to proceed." White Ex. 2. Then, after Defendants filed their motion to dismiss, Plaintiffs' reversed course: they filed an amended complaint that abandoned their implied covenant claims and advanced only a superficially modified *Bivens* claim. Defendants wrote to Plaintiffs again, expressing surprise at Plaintiffs' about-face. As defendants explained:

> At this point, it is incumbent on you to have pleaded the facts and allegations that you believe support your claims—before we expend additional resources litigating

---

[1] Citations to "White Ex. __" are to exhibits attached to the Declaration of Lauren Gallo White.

> any further motions to dismiss. … If we do not hear from you, we will understand that ICAN has pleaded its best case, and that we, and more importantly the Court, can now evaluate that complaint to conclusively determine whether it can plausibly state a claim under applicable legal standards.

White Ex. 3. Plaintiffs have not responded. Given that choice, and because the First Amendment is meant to protect against the "burden and expense of litigating," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785, n.21 (1978), dismissal should be with prejudice.

## BACKGROUND

### A.    YouTube, Facebook, And Their Content Policies

YouTube and Facebook are popular online services for sharing videos and related content. ¶ 28.[2] They offer separate services and operate independently of each other. The use of both platforms is governed by rules and policies that make clear that certain kinds of content are not allowed and that YouTube and Facebook have discretion to remove unwanted material from their services. ¶¶ 30-31, 61. More specifically, to create a channel and post videos, Plaintiffs agreed to YouTube's Terms of Service and the incorporated Community Guidelines. See ¶¶ 22, 68; Compl. Ex. A;[3] Terms of Service, White Ex. 4 (YouTube's "TOS"); Community Guidelines, White Ex. 5 (YouTube's "Community Guidelines").[4] Similarly, to create a Page and use Facebook, Plaintiffs agreed to Facebook's Terms of Service and the incorporated Community Standards. See ¶ 22, 75; White Ex. 6 (Facebook's "TOS"); White Exs. 7, 11, 12 (Facebook's "Community Standards").

1.    YouTube's Terms of Service and Rules Against Medical Misinformation

YouTube's Terms of Service provide that "YouTube is under no obligation to host or serve Content." White Ex. 4 at 4. The TOS put users on notice that, "[i]f you choose to upload

---

[2] References to " ¶ __" are references to the FAC.

[3] Citations to Compl. Ex. __ are to the exhibits attached to the original Complaint. Though these exhibits were not reattached to the FAC, they are cited and quoted within the FAC. *See, e.g.*, ¶¶ 31, 69, 74.

[4] Defendants' respective terms of user agreements and incorporated content policies are properly before the Court on this motion to dismiss because those documents are expressly referenced in Plaintiffs' FAC. *See, e.g.*, ¶¶ 68, 75 (citing YouTube and Facebook's respective TOS); ¶¶ 61, 63-66 (citing and quoting YouTube and Facebook's respective Community Guidelines and content policies); *accord Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Content, you must not submit to the Service any Content that does not comply with this Agreement (including the YouTube Community Guidelines)." *Id.* at 7-8. The TOS also state that "[i]f we reasonably believe that any Content is in breach of this Agreement or may cause harm to YouTube, our users, or third parties, we may remove or take down that Content in our discretion." *Id.* at 9. The TOS expressly incorporate the Community Guidelines, which describe in detail the types of content that are not allowed on YouTube. YouTube's policy on child safety, for example, forbids "encouraging minors to do dangerous activities." White Ex. 8 at 1. Similarly, YouTube's policy on harmful or dangerous content forbids, among other things, "[s]howing viewers how to perform activities meant to kill or maim others." White Ex. 9 at 1. Last year, in keeping with these rules, YouTube specifically incorporated a COVID-19 misinformation policy into its Community Guidelines. White Ex. 10 ("COVID Policy"); ¶ 61. The COVID Policy clarifies that YouTube "doesn't allow content that spreads medical misinformation that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19." White Ex. 10 at 1; ¶ 60 (quoting same). This expressly includes "Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO," and "Content that disputes the efficacy of local health authorities' or WHO's guidance on physical distancing or self-isolation measures to reduce transmission of COVID-19." White Ex. 10 at 1.

In addition to reserving the right to remove content, YouTube's agreements make clear that YouTube has the right to suspend or terminate users who violate YouTube's rules or submit material that YouTube does not allow on its service. As the Terms of Service explain: "YouTube may suspend or terminate your access, your Google account, or your Google account's access to all or part of the Service" for multiple reasons, including if "you materially or repeatedly breach this Agreement," or if "we believe there has been conduct that creates (or could create) liability or harm to any user, other third party, YouTube or our Affiliates." White Ex. 4 at 10.

2.   Facebook's Terms of Service and Rules Against Medical Misinformation

Facebook's Terms of Service are similar. They provide that a user may not use Facebook "to do or share anything: [1] That violates these Terms, our Community Standards, and other

terms and policies that apply to your use of Facebook. [2] That is unlawful, misleading, discriminatory or fraudulent. [3] That infringes or violates someone else's rights, including their intellectual property rights." White Ex. 6 at 3. Facebook's Community Standards, which are expressly incorporated into its Terms, elaborate on the kind of content that Facebook may remove. Facebook's safety policy, for example, prohibits content that "intentionally or unintentionally celebrate[s] or promote[s] suicide or self-injury." White Ex. 11 at 1. Similarly, Facebook's policy on violence and criminal behavior bars content that promotes "[h]arm against people," including "[p]romoting or advocating for harmful miracle cures for health issues." White Ex. 12 at 1. Facebook has also elaborated on how its policies apply in light of the ongoing COVID-19 pandemic and has explained that it prohibits content "[c]oordinating, depicting, admitting to or promoting active and deliberate spread of communicable diseases by you or your associates." *Id*. at 1. Likewise, its policies prohibit content "coordinating interference with the administration of the COVID-19 vaccine," and "calling to action, advocating, or promoting that others not get the COVID-19 vaccine." *Id*. at 3.

Facebook expressly retains the authority to "remove or restrict access to content that is in violation of these provisions." White Ex. 6 at 3. In addition, the Terms provide that Facebook may "suspend or permanently disable access to your account" if "we determine that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards. *Id*. at 4.

**B.      Informed Consent Action Network**

According to the First Amended Complaint, ICAN is a non-profit network that "investigates and disseminates information regarding public health safety issues," and Del Bigtree is the host of the HighWire, a show that "sheds light on governmental oversight in the area of vaccine and drug development." ¶¶ 15-17.

1.      Plaintiffs' Videos on YouTube and Facebook

The FAC expressly references and puts at issue the contents of Plaintiffs' videos, which therefore may be considered by the Court on this motion. ¶¶ 67-69, 72-73 (referencing Ex. B attached to the Complaint); *accord Knievel*, 393 F.3d at 1076. Plaintiffs' videos repeatedly

1    contradict both local health authorities and WHO's medical information about COVID-19. *See*

2    White Exs. 13 to 15.[5] For example, Plaintiffs' videos often tout the importance of *not* wearing

3    masks and repeatedly assert that COVID-19 is a mild sickness that people should want to catch.

4    White Ex. 13 at 7:2-24; White Ex. 14 at 5:8-10; *see also* Compl., Ex. B at 12-13, 4-5

5    (referencing same two videos). In the same vein, Plaintiffs' videos expressly encourage viewers

6    to ignore government restrictions and break quarantine. White Ex. 13 at 6:19-25; 7:1-2; 7:21-24.

7        It is not surprising that videos like these found themselves running afoul of each

8    Defendant's content rules. Thus, the FAC alleges that, on July 3, 2020, YouTube "took down a

9    video featuring a doctor discussing hydroxychloroquine, stating that this video violated

10   YouTube's community guidelines." ¶ 69. That video was titled "DR. ZELENKO: HCQ

11   DENIERS ARE 'GUILTY OF MASS MURDER.'" Compl. Ex. B at 2. Likewise, on July 7,

12   YouTube took down a video called "MASK TEST PROVES TOXIC FOR CHILDREN," *Id.* at

13   4; on July 9, it took down "THIS LIVE MASK TEST SHOCKS VIEWERS," *id.* at 6; and on

14   July 28, it took down "MASKS ARE A JOKE," *id.* at 8, "SHOULD YOU REALLY WEAR A

15   MASK?", *id.* at 10, and "WE NEED TO CATCH THAT COLD!", *id.* at 12. The next day (July

16   29), YouTube took down "ICAN VS CDC." *Id.* at 15.

17       After removing seven videos in less than a month under YouTube's COVID-

18   misinformation policy, YouTube terminated ICAN's channel on July 29, 2020. ¶ 11. Plaintiffs

19   were well aware this was possible; indeed, one of their videos expressly acknowledged that their

20   content might get Plaintiffs kicked off the platform, and the video goes on to provide a secondary

21   web address for viewers to find their content should that happen. White Ex. 15 at 4:9-16 ("Or

22   perhaps, you're on our website, thehighwire.com, which I want all of you to sign up to in case

23   we ever get kicked off of Facebook or some other social media platform -- if you're on

24   thehighwire.com or any of those platforms, all you do is text 33222 and type in ICAN in the

---

[5] Attached to the Declaration of Lauren Gallo White are transcripts of the following videos, alleged in the FAC to have been uploaded to YouTube by ICAN and titled: "WE NEED TO CATCH THAT COLD!" (White Ex. 13; *see* Compl. Ex. B at 12-13); "MASK TEST PROVES TOXIC FOR CHILDREN" (White Ex. 14; *see* Compl. Ex. B at 4-5); and "ICAN VS CDC" (White Ex. 15; *see* Compl. Ex. B at 15-16).

message, and we will send you the information from today's show."); *see also* Compl. Ex. B. at 15-16 (referencing same video).

Acting independently of YouTube, Facebook deactivated ICAN's page on November 21, 2020. ¶ 11. This decision also followed Facebook's repeated removal of offending content from ICAN's Page. Specifically, between July and November, Facebook removed no less than six posts. ¶¶ 73-74 (referencing Exhibit C attached to the Complaint). Many of these—with titles like "MASK TEST PROVES TOXIC FOR CHILDREN," "MASKS ARE A JOKE," and "WE NEED TO CATCH THIS COLD!"—violated Facebook's "Community Standards on misinformation that can cause physical harm." ¶ 73; Compl. Ex. C at 5, 7, 10, 12-14. But at least one post was removed for hate speech. Compl. Ex. C at 3, 6. After a clear warning that "[y]our Page is at risk of being unpublished because of continued Community Standards violations," Compl. Ex. C at 9, Facebook finally unpublished the Page.

### 2.    Plaintiffs' Allegations About Members of Congress

In the FAC, Plaintiffs attempt to connect Defendants' content moderation decisions to Congressman Adam Schiff and other members of Congress, who the FAC alleges pressured Defendants to remove Plaintiffs' content. ¶¶ 5, 7-14. Plaintiffs do not suggest these legislators singled out ICAN or Mr. Bigtree or urged Defendants to remove their content specifically. Nor do they point to any actual legal mandate, threats, or coercive action that the legislators aimed at Google or Facebook. Instead, Plaintiffs point only to the following:

- In letters dated February 14, 2019 and April 29, 2020, Mr. Schiff wrote to Google, Facebook, and other "social media companies" to request more information about the steps they were taking to "curb vaccine 'misinformation,'" and to urge them to "tackle coronavirus misinformation." ¶¶ 42-43, 47.

- At a June 13, 2019 committee hearing, "Schiff openly challenged the continued appropriateness of § 230 [*i.e.*, 47 U.S.C. § 230] immunity as regards social media networks." ¶ 35; *see also* ¶ 36 (then-President Elect Biden "has also openly criticized the § 230 immunity").

- In April 2019, Representative Jerrold Nadler expressed concerns over "direct regulation of social media censorship by law and said, 'Let's see what happens by just pressuring them first.'" ¶ 53.

- Around April 2019, Representative Cedric Richmond "told Defendants to restrict content lest they face increased Congressional regulations." ¶ 54.

- In hearings before the Financial Services Committee in October 2019, Representative Maxine Waters "quizzed Zuckerberg on Facebook's steps to combat misinformation and voter suppression," and "suggested policymakers should consider breaking up Facebook." ¶ 58.

- "Various Congressional Committees have been working relentlessly to address issues concerning 'misinformation' on social media." ¶ 55.

These allegations are the sum total of government action alleged in the FAC.

Nevertheless, based on this theory, Plaintiffs filed this lawsuit on December 30, 2020, asserting claims against YouTube and Facebook under both the First Amendment (through the implied cause of action recognized in *Bivens*) and for violation of the implied covenant of good faith and fair dealing. Compl. ¶¶ 72-93. Plaintiffs' initial Complaint sought damages and injunctive relief. Compl., Prayer for Relief at 1-3. After Defendants moved to dismiss the Complaint (Dkt. 40), and after Facebook moved to strike Plaintiffs' implied covenant claim pursuant to California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 (Dkt. 41), Plaintiffs abandoned their implied covenant claims and their prayer for monetary damages.[6] The FAC now asserts a single claim under *Bivens* for alleged violation of the First Amendment (¶¶ 85-94) and seeks a mandatory injunction compelling Defendants to "restore" their YouTube channel and

---

[6] Facebook intends to seek fees for the preparation of its independent anti-SLAPP motion. *See Moore v. Liu*, 69 Cal. App. 4th 745, 752 (1999) ("Persons who threaten the exercise of another's constitutional rights to speak freely … should be adjudicated to have done so, not permitted to avoid the consequences of their actions by dismissal of the SLAPP suit when a defendant challenges it."); *Coltrain v. Shewalter*, 66 Cal. App. 4th 94, 106 (1998) ("Otherwise, SLAPP plaintiffs could achieve most of their objective with little risk—by filing a SLAPP suit, forcing the defendant to incur the effort and expense of preparing a special motion to strike, then dismissing the action without prejudice.").

1   Facebook Page and precluding Defendants from enforcing their rules against Plaintiffs in the

2   future. FAC, Prayer for Relief at 1-3.

3                                    **ARGUMENT**

4           To survive a motion under Rule 12(b)(6), "[t]hreadbare recitals of the elements of a cause

5   of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S.

6   662, 678 (2009). Instead, Plaintiffs must allege "factual content that allows the court to draw the

7   reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Court is not

8   required to "assume the truth of legal conclusions merely because they are cast in the form of

9   factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Nor should the Court

10  accept allegations that rest on "unwarranted deductions of fact[] or unreasonable inferences." *In*

11  *re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

12  **I.      PLAINTIFFS CANNOT STATE A *BIVENS* CLAIM FOR VIOLATION OF THE**

13  **        FIRST AMENDMENT**

14          Plaintiffs claim that Defendants violated the First Amendment when they removed

15  Plaintiffs' videos and channels from their platforms. ¶¶ 85-92. This claim, which is asserted

16  under the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Fed. Bureau of*

17  *Narcotics*, 403 U.S. 388 (1971), fails as a matter of law on multiple, independent grounds.

18          **A.      Facebook And YouTube Are Private Parties, Not State Actors**

19          "The Free Speech Clause does not prohibit *private* abridgment of speech." *Manhattan*

20  *Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). Plaintiffs, of course, do not dispute

21  that Facebook and YouTube are private parties, not state actors. ¶¶ 1, 88. And under settled law,

22  their content-moderation decisions are not subject to First Amendment constraints. The Ninth

23  Circuit made that clear in *Prager*, expressly holding that YouTube is not a state actor and cannot

24  be sued under the First Amendment for its editorial decisions about whether and under what

25  conditions to display content on its private platform. *Prager*, 951 F.3d at 994, 997-99 ("[D]espite

26  YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a

27  public forum subject to judicial scrutiny under the First Amendment."). The Ninth Circuit's

28  decision echoes a long and unbroken line of cases—before and after *Prager*—rejecting similar

First Amendment claims against private online service providers. *See, e.g., Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. May, 27, 2020), *petition for cert. filed*, No. 20-969 (U.S. Jan. 2, 2021); *Howard v. AOL*, 208 F.3d 741, 754 (9th Cir. 2000); *Fed. Agency of News, LLC v. Facebook, Inc.,* 395 F. Supp. 3d 1295, 1308-1314 (N.D. Cal. 2020).[7]

Plaintiffs try to get around these precedents by asserting that YouTube and Facebook "should be treated as state actors because they acted based on the encouragement, coercion, and/or threats of powerful government officials." ¶ 89; *see also, e.g.,* ¶¶ 42-51. Plaintiffs seem to be trying to invoke the so-called "state compulsion test" for state action. But this test is concerned with whether the government can be held liable for the acts of a private party. *See Sutton v. Providence St. Joseph Med, Ctr.*, 192 F. 3d 826, 838 (9th Cir. 1999) ("[T]he government cannot escape liability when it compels a result, even though the government does not actually engage in the unlawful act but, instead, pressures another to do so." (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-1005 (1982))). Because Facebook and YouTube are private actors, they cannot be held liable under a compulsion theory. And in any event, under established law, Plaintiffs' actual allegations fall far short of any plausible theory of government compulsion (or any other theory of state action).

## B.     The Government-Compulsion Theory Creates No Basis For Holding Private Entities Liable As State Actors

As an initial matter, Plaintiffs' effort to use a compulsion theory to assert a constitutional claim directly against private parties flies in the face of Ninth Circuit precedent. *Sutton* held

---

[7] *See also, e.g.*, *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1111 (2020); *Ebeid v. Facebook, Inc.*, 2019 WL 2059662, at *6 (N.D. Cal. May 9, 2019); *Green v. YouTube, LLC*, 2019 WL 1428890, at *4 (D.N.H. Mar. 13, 2019); *Fehrenbach v. Zeldin*, 2018 WL 4242452, at *2-3 (E.D.N.Y. Aug. 6, 2018); *Nyabwa v. FaceBook*, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018); *Quigley v. Yelp, Inc.*, 2018 WL 7204066, at *3 (N.D. Cal. Jan. 22, 2018); *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017); *Kim v. Apple, Inc.*, 2014 WL 3056136, at *2 (D.D.C. July 7, 2014), *aff'd* 582 F. App'x 3 (D.C. Cir. 2014); *Kinderstart.com, LLC v. Google, Inc.*, 2007 WL 831806, at *13-14 (N.D. Cal. Mar. 16, 2007); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016); *Young v. Facebook, Inc.*, 2010 WL 4269304, at *2 (N.D. Cal. Oct. 25, 2010); *cf. Rutenburg v. Twitter, Inc.*, 2021 U.S. Dist. LEXIS 27539 (N.D. Cal. Feb. 11, 2021) (issuing *sua sponte* Order to Show Cause why case asserting First Amendment claim against Twitter for terminating user account should not be dismissed for lack of state action).

expressly that "a plaintiff must show 'something more' than state compulsion in order to hold a private defendant liable as a government actor." *Id.* at 838. That holding reflects the fact that the foundational state compulsion cases were lawsuits brought against the government challenging actions that had been carried out through private parties. *Id*. at 836-37. For example, *Blum* involved claims against government officials (the Commissioners of the New York Department of Social Services and the Department of Health). *See* 457 U.S. at 995-96, 1003 ("This case is obviously different from those cases in which the defendant is a private party…"). In that context, the Supreme Court found no state action in the decision of private nursing homes to discharge patients without notice or a hearing. *Id*. at 1005. The Court explained that "*a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.*" *Id*. at 1004 (emphasis added).

As the Ninth Circuit held in *Sutton*, however, the responsibility does not run both ways: "in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is *not* responsible for the government's compulsion." *Sutton*, 192 F.3d at 838. To the contrary, "only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion." *Id*. (quotation marks omitted). In short, to the extent Plaintiffs' theory is that the government used "pressure tactics to compel" YouTube and Facebook "to censor vaccine related speech," ¶ 44, they must sue the government, not private party Defendants.

## C.   Plaintiffs' Allegations That Members of Congress Pressured Defendants Does Not Create A Viable Basis For State Action

Even setting aside that threshold defect, Plaintiffs' state action theory also fails because they have neither alleged any actual state compulsion nor directly tied any such compulsion to the specific actions challenged. A theory that the government compelled private action obviously requires genuine coercion by the government. *See Heineke v. Santa Clara Univ.*, 965 F.3d 1009,

1013-1014 (9th Cir. 2020). And as the Ninth Circuit explained, state action can be found on such a theory only when the government "commanded a particular result in, or otherwise participated in, [the plaintiff's] *specific* case." *Id.* at 1014 (emphasis added); *accord Blum*, 457 U.S. at 1010 (no state action where government regulations did "not dictate the decision to discharge or transfer in a particular case"); *Johnson v. Knowles*, 113 F.3d 1114, 1120 (9th Cir. 1997) (no state action where "Plaintiffs cannot point to any state regulation or custom having the force of law that compelled, coerced, or encouraged the Defendants to discriminate against the Plaintiffs").

Applying these requirements, another court in this District very recently dismissed a nearly identical First Amendment claim against Google and YouTube that sought to establish state action based on some of the same letters from Adam Schiff and the same theory that "Congressional representatives coerced defendants into taking action to remove content from the YouTube platform that resulted in YouTube's removal of [Plaintiff's] videos from the YouTube service." *Daniels*, 2021 WL 1222166, at *3. As Judge DeMarchi explained,

> [Plaintiff] does not plead any facts that support his argument that the federal government 'coerced' or 'significantly encouraged' defendants to remove his specific Fauci and George Floyd videos from YouTube's platform. His speculative assertions about the possibility defendants will be subpoenaed to testify before Congress or exposed to some other peril if they ignore letters from Congressional representatives do not support a theory of government action.

*Id.* at *6; *see also id.* ("Mr. Daniels does not allege that the federal government directed a particular result with respect to his Fauci and George Floyd videos.").

Plaintiffs' allegations here have the same problem. Plaintiffs' do not allege that ***the government*** exercised any actual "coercive power" over Defendants' content-moderation decisions, much less that it compelled YouTube or Facebook to take the "specific" action at issue here (the removal of Plaintiffs' content and the suspension of their accounts). The FAC identifies no official government action that played any role in Defendants' actions. Instead, Plaintiffs' compulsion theory is based on the public statements of a handful of Congressional committees and individual members of Congress, which Plaintiffs believe somehow influenced YouTube and Facebook. But despite extensive rhetoric (¶¶ 7-10, 32-58), the FAC's actual factual allegations are remarkably thin. As set out above, Plaintiff's allegations boil down to a single vague

reference to the agendas of "various Congressional Committees" and a handful of statements by individual members of Congress—several by Adam Schiff seeking "additional information" on what Google and Facebook were doing to address vaccine misinformation, vaguely questioning "continued appropriateness of § 230" to social media platforms, and offering advice about "best practices" for COVID-19 and other health-related misinformation—and a few more from Representatives Jerrold Nadler, Cedric Richmond, and Maxine Waters regarding census misinformation, voter suppression, and a general need to regulate Defendants and other online platforms. *See supra* pp. 7-8 (quoting ¶¶ 35, 53, 54, 58).

None of this makes Defendants into state actors. Obviously, statements from Adam Schiff, Jerrold Nadler, Cedric Richmond, and Maxine Waters did not have any actual legal force; they spoke only for themselves, not for other members of Congress, much less for Congress as a whole. Nor did these Congresspeople threaten YouTube or Facebook in any way. Their statements did not direct or instruct Defendants to take any particular action, certainly not to remove content or terminate user accounts, and certainly not to terminate or remove content from *Plaintiffs'* accounts. None of these Representatives ever so much as *mentioned* Plaintiffs or their content. As a matter of law, statements like these from individual members of Congress cannot transform private content-moderation into state action.

*Daniels* is squarely on point. The plaintiff there relied on some of the same statements at issue here (including those made by Adam Schiff) in claiming that YouTube had engaged in state action. Judge DeMarchi rejected that theory:

> [Plaintiff] does not plead any facts suggesting that Speaker Pelosi or Rep. Schiff were personally involved in or directed the removal of Mr. Daniels's videos. He alleges only that they wanted certain kinds of videos removed and that his videos fell within that category ….. [S]uch allegations do not reflect the kind of governmental involvement in the conduct of private defendants that is sufficient to support a nexus theory of government action.

*Daniels*, 2021 WL 1222166, at *7. Likewise, in *Abu-Jamal v. Nat'l Pub. Radio*, 1997 WL 527349, at *1, *6 (D.D.C. Aug. 21, 1997), the plaintiff challenged on First Amendment grounds NPR's decision not to air his political commentaries. The plaintiff argued that remarks made by then-Senator Dole (among others) had directly pressured NPR specifically to cancel the program,

1    rendering NPR's otherwise private decision state action. *Id*. at *2. The court disagreed:

2    "Assuming that the [Fraternal Order of Police] and individual members of Congress did call

3    NPR in attempts to pressure it not to air the program, not one of these people has any legal

4    control over NPR's actions." *Id*. at *6.

5         The same is true here. Mr. Schiff has no legal control over Defendants or their actions.

6    His public statements and letters—which, again, made no reference to ICAN or its content—

7    lacked any legal force. Referring to such statements as "threats" (¶¶ 7, 89) does not change that

8    reality or transform Defendants' actions into those of the government. In fact, this is an even

9    easier case than *Abu-Jamal*. There, no state action was found even though Rep. Dole had referred

10   *specifically* to the plaintiff's broadcast and expressly urged NPR not to air it. *Cf. Daniels*, 2021

11   WL 1222166, at *6 (discussing *Abu-Jamal* and rejecting state action where plaintiff "cannot

12   plausibly allege that Speaker Pelosi and Rep. Schiff have legal control over defendant' actions,

13   or that either of them ever contacted defendants about Mr. Daniels's Fauci or George Floyd

14   videos"). Here, in contrast, none of the members of Congress said anything about Plaintiffs or

15   the specific content.

16        Indeed, earlier this year, a court expressly held that Mr. Schiff's same statements about

17   medical misinformation had no causal connection to content-moderation decisions by Google,

18   Facebook, and other private social-media platforms. In *Association of American Physicians &*

19   *Surgeons v. Schiff*, plaintiffs who published and sought out information about vaccines sued Mr.

20   Schiff claiming that "a number of technology companies took several adverse actions against

21   them because of Congressman Schiff's statements"—the same February 14, 2019 letter and June

22   13, 2019 committee hearing statement at issue in this case. 2021 WL 354174, at *2 (D.D.C. Feb.

23   2, 2021) ("AAPS"). The court dismissed the claim, finding that any injury plaintiffs had suffered

24   as a result of content-moderation decisions by online platforms was not "fairly traceable" to Mr.

25   Schiff's words. As the Court explained, "Plaintiffs' case depends on an analytical leap based on

26   bald speculation rather than allegations of fact. The open letters and public statements made by

27   Congressman Schiff do not mention AAPS, do not advocate for any specific actions, and do not

28   contain any threatening language." *Id*. at *5. This case presents a mirror image of that same

problem. Just as the plaintiffs in *AAPS* could offer no plausible allegations that Mr. Schiff's statements were the cause of private platforms' restrictive actions, Plaintiffs here have no plausible allegation that YouTube and Facebook did what they did as the result of unlawful coercion from Mr. Schiff's same statements (or the similar statements made by the other members of Congress referenced in the FAC).

Beyond being at odds with these cases, Plaintiffs' state action theory disregards settled legal principles. "[R]egulatory interest in a problem [does not] transform[] any subsequent private efforts to address the problem (even those expressly designed to obviate the need for regulation) into state action." *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Indeed, even in the case of actual laws, merely "being regulated by the State does not make one a state actor." *Halleck*, 139 S. Ct. at 1932. It follows, as Judge DeMarchi explained, that acting in ways consistent with the *informal* wishes of a few individual lawmakers—who possess no independent regulatory authority—cannot amount to state action: "The publicly expressed views of individual members of Congress—regardless of how influential—do not constitute 'action' on the part of the federal government." *Daniels*, 2021 WL 1222166, at *6.

Accepting Plaintiffs' baseless theory would have far-reaching and pernicious consequences. Plaintiffs effectively ask the Court to find that, if any of the 535 members of Congress publicly states a view about how a private business should operate, that business thereby becomes a state actor when it acts consistent with the legislator's suggestion. Like the state-action theory rejected in *Halleck*, this theory "would be especially problematic in the speech context, because it could eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms." 139 S. Ct. at 1932. Under Plaintiffs' logic, a single legislator expressing a preference for online platforms to more aggressively limit some form of objectionable content (whether pornography or hate speech or extremist propaganda) would perversely have the exact opposite effect, constitutionally disabling those platforms from removing such material, even where the material violates the service's own rules for acceptable speech. In short, Plaintiffs' approach threatens to do just what the Supreme Court has warned against: "Expanding the state-action doctrine beyond its traditional boundaries

would expand governmental control while restricting individual liberty and private enterprise."
*Id*. at 1934.[8]

### D.   The *Bivens* Implied Right of Action Does Not Apply To Claims Against Private Corporations

While the lack of state action is enough to reject Plaintiffs' First Amendment claim, any effort to invoke *Bivens* to bring this claim against Defendants here also fails for an independent reason: *Bivens* has never been applied against a private corporation, and the Supreme Court has made clear that it cannot be extended to cases like this.

In *Bivens*, the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). But, as the Court has repeatedly explained, "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856-57 (2017); *accord Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) ("for almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens*"); *Malesko*, 534 U.S. at 68 (explaining that since *Carlson v. Green*, 446 U. S. 14 (1980), "we have consistently refused to extend *Bivens* liability to any new context or new category of defendants"). In keeping with that principle, the Supreme Court has limited *Bivens* to specific contexts, which are concerned "*solely with deterring the unconstitutional acts of individual officers*," *Malesko*, 534 U.S. at 71 (emphases added). "Where such circumstances are not present, we have consistently rejected

---

[8] Plaintiffs also make a passing reference to the "interdependence between Chairman Schiff and the Defendants." ¶ 91. Insofar as Plaintiffs meant to invoke the alternative "joint action" test for state action, they make no effort to support such a theory with any factual allegations. That is not surprising: Plaintiffs have no basis to suggest that Defendants entered into some kind of joint venture with the government to censor their content. *Accord Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (describing "substantial degree of cooperation" required for "joint action"). Nor, again, have plaintiffs alleged governmental involvement in the specific decisions challenged here. *See Mathis*, 75 F.3d at 503-04 (despite "close cooperation" with government Task Force, no joint action where Task Force did not participate in individual disciplinary action underlying dispute); *see also Daniels*, 2021 WL 1222166, at *8. Plaintiffs cannot overcome their inability to allege state action by claiming that "further information that may be relevant … can only be revealed through discovery." ¶ 93. Plaintiffs cannot turn their pleading deficiencies into cause for discovery. *See Iqbal*, 556 U.S. at 678 (a plaintiff "armed with nothing more than conclusions" cannot "unlock the doors of discovery"); *Mireskandari v. Daily Mail & General Trust PLC*, 2013 WL 12129944, at *3 (C.D. Cal. Jan. 14, 2013) (explaining that discovery is "intrusive, expensive, and expression-chilling").

invitations to extend *Bivens*, often for reasons that foreclose its extension here." *Malesko*, 534 U.S. at 70. The Court has expressly refused to apply *Bivens* to claims even against government agencies (as opposed to individual officers), *FDIC v. Meyer*, 510 U. S. 471, 484-486 (1994), or against private corporations undisputedly acting under color of federal law, *Malesko*, 534 U.S. at 70-75.

These principles categorically foreclose any application of *Bivens* in this case. Plaintiffs seek to assert constitutional tort claims against wholly private companies. That flies in the face of *Malesko*, which rejected *Bivens* liability against a private corporation operating a prison under a government contract. As the Court explained, allowing such claims against corporate entities would be inconsistent with "[t]he purpose of *Bivens*": "to deter *individual federal officers* from committing constitutional violations." *Malesko*, 534 U.S. at 70-71 (emphasis added). Given that limited purpose, "inferring a constitutional tort remedy against a private entity like CSC is therefore foreclosed." *Id.* at 71. It is not surprising, therefore, that the Supreme Court has *never* allowed a *Bivens* claim to be asserted against a corporation and, since *Malesko*, no other federal court has done so either. *See Martinez v. GEO Grp., Inc.*, 2020 WL 2496063, at *17-18 (C.D. Cal. Jan. 7, 2020) ("[C]ourts have never implied a *Bivens* remedy where the defendant is an entity instead of an individual."). In short, as in *Malesko*, the "caution toward extending *Bivens* remedies into any new context, a caution consistently and repeatedly recognized for three decades, forecloses such an extension here." 534 U.S. at 74.

That is especially true here because, as discussed *infra* pp. 18-19, expanding *Bivens* to this situation would intrude on Defendants' own protected right to exercise editorial control over the content on their platforms. As the Supreme Court has explained, "a *Bivens* remedy will not be available if there are special factors counselling hesitation." *Ziglar*, 137 S.Ct. at 1857 (quotation marks omitted). Those special factors include "context[s] in which Congress has designed its regulatory authority in a guarded way" and those where "some other feature of a case … causes a court to pause before acting without express congressional authorization." *Id.* at 1858. Here, the First Amendment—which protects against claims that would impose liability based on Defendants' decisions to remove content from their private platforms, *see infra* pp.18-

1    19—"make it less probable that Congress would want the Judiciary to entertain a damages suit"

2    or expand an implied right of action in this case. *Id.*

3    **II.     THE FIRST AMENDMENT INDEPENDENTLY BARS PLAINTIFFS' *BIVENS***

4    **CLAIM**

5           Plaintiffs have the relevant First Amendment interests exactly backwards. Far from

6    violating the First Amendment, YouTube's and Facebook's editorial decisions about the content

7    they permit on their platforms are themselves protected by the First Amendment. Indeed, even

8    Plaintiffs begrudgingly admit that "YouTube and Facebook arguably have some rights to

9    moderate content on their platforms." ¶ 77.

10          In light of the ongoing pandemic, Defendants have exercised those rights to curtail the

11   spread of potentially dangerous misinformation about COVID-19 treatment, vaccination, or

12   transmission. *See* ¶ 61. YouTube's policy, for example, prohibits "content about COVID-19 that

13   poses a serious risk of egregious harm," including content that "spreads medical misinformation

14   that contradicts local health authorities' or the World Health Organization's (WHO) medical

15   information about COVID-19." White Ex. 10 at 1. Facebook similarly has committed to

16   removing "content with false claims or conspiracy theories that have been flagged by leading

17   global health organizations and local health authorities that could cause harm to people who

18   believe them." White Ex. 16 at 51.[9]

19          These policies reflect Defendants' editorial judgment that information that contradicts the

20   advice of public health authorities regarding COVID-19 is harmful, and that removing such

21   information may help keep their user communities safe. *See* White Exs. 10, 16 at 1. Because

22   "one important manifestation of the principle of free speech is that one who chooses to speak

23   may also decide 'what not to say,'" Defendants' determinations that such content is not welcome

24   on their platforms is plainly entitled to First Amendment protection. *Hurley v. Irish-Am. Gay,*

25   *Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995); *see also id.* at 570 ("[T]he

26   presentation of an edited compilation of speech generated by other persons … fall[s] squarely

27   within the core of First Amendment security."); *La Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d

28   _____

     [9] This document is expressly referenced in Plaintiffs' FAC. ¶ 61.

981, 991 (S.D. Tex. 2017) ("Facebook [has a] First Amendment right to decide what to publish and what not to publish on its platform.").

Yet through this lawsuit, Plaintiffs ask this Court to deprive Defendants of the choice "not to propound a particular point of view." *Hurley*, 515 U.S. at 573, 575. The First Amendment does not allow this result. *Id.*; see also *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257-258 (1974) (striking down law requiring newspapers to publish certain third-party speech); *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014) (search engine's judgment about what content to exclude from its search results protected by First Amendment); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-630 (D. Del. 2007) (same); *Search King Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *3 (W.D. Okla. May 27, 2003) (same). Indeed, the magnitude of the burden Plaintiffs would impose on Defendants' First Amendment rights is made clear by the relief they seek: "[a]n order directing [Defendants] to restore" Plaintiffs' social media accounts and posts and "enjoining Defendants" from exercising editorial control in the future. FAC, Prayer for Relief at 1-3. That is compelled speech, and it is flatly foreclosed by the First Amendment. Just as "the courts … should [not] dictate the contents of a newspaper," *Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135 (9th Cir. 1971), Plaintiffs may not use the courts to force Defendants to publish their videos and other content. Doing so would impermissibly "[m]andat[e] speech that [Defendants] would not otherwise make." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

## **CONCLUSION**

The FAC should be dismissed. Because it is now abundantly clear that Plaintiff's claim cannot be cured by amendment, dismissal should be with prejudice.

1

2

3    Dated: April 12, 2021

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

WILMER CUTLER PICKERING, HALE
AND DORR LLP

By:    /s/ Sonal N. Mehta
       SONAL N. MEHTA

*Attorney for Defendant Facebook, Inc.*

WILSON SONSINI GOODRICH & ROSATI

By:    /s/ Lauren Gallo White
       Lauren Gallo White

*Attorney for Defendant YouTube, LLC*

1

## <u>SIGNATURE ATTESTATION</u>

2        I, Lauren Gallo White, hereby attest that all other signatories listed, and on whose behalf

3 the filing is submitted, concur in the filing's content and have authorized the filing of this e-filed

4 document. I further attest that I have on file all holographic signatures corresponding to any

5 signatures indicated by a conformed signature (/S/) within this e-filed document.

6                                    By:      */s/ Lauren Gallo White*
                                              Lauren Gallo White
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28