UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE INFORMED CONSENT ACTION NETWORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>YOUTUBE LLC, et al.,<br><br>Defendants. | Case No. 20-cv-09456-JST<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 47 |

Plaintiffs, the Informed Consent Action Network and founder Del Bigtree (collectively "ICAN"), contend that Defendants, YouTube LLC and Facebook Inc., violated the First Amendment by removing ICAN's videos from and suspending its accounts on their social media platforms. Before the Court is Defendants' motion to dismiss. ECF No. 42. For the reasons that follow, the Court will grant the motion.

**I.   BACKGROUND**

   **A.   Parties**

Founded in 2016, ICAN is a Texas-based "non-profit entity . . . dedicated to criticizing governmental positions on health-related issues." First Amended Complaint ("FAC"), ECF No. 42 ¶¶ 2, 15. ICAN's mission is to "raise awareness about public health safety" by "investigat[ing] and disseminat[ing] information regarding public health safety issues, including through its website . . . , postings on social media, press events and releases." *Id.* ¶ 15. As part of its activities, ICAN produces "The HighWire with Del Bigtree," an "internet-based talk show." *Id.* ¶¶ 15, 18. ICAN shared videos of The HighWire program using its accounts on Facebook and YouTube. *Id.* ¶ 18.

Defendants YouTube and Facebook are both California-based companies incorporated in

Delaware. *Id.* ¶¶ 20-21.  Both companies operate social media platforms that allow users to upload and share video content, subject to Defendants' respective terms of use.  *See id.* ¶¶ 27, 31.

### B. ICAN's Removal from YouTube and Facebook

In the wake of the COVID-19 pandemic, Defendants adopted policies to combat perceived misinformation about the coronavirus.  *Id.* ¶ 10.  YouTube's policy prohibited sharing "content about COVID-19 that . . . poses a serious risk of egregious harm." *Id.*  Accordingly, YouTube would not permit content that "spreads medical misinformation that contradicts local health authorities' or the World Health Organization's . . . medical information about COVID-19." *Id.*  Similarly, Facebook's policy noted that the platform would "remove content that 'leading global health organizations and local health authorities' flagged as contrary to their official statements about COVID-19." *Id.*

Based on these policies, on July 3, 2020, YouTube removed a video of a doctor discussing the drug hydroxychloroquine that ICAN had posted on its channel, The HighWire. *Id.* ¶ 69.  Over the following weeks, YouTube removed seven additional videos from ICAN's channel before terminating its account on July 29, 2020. *Id.*  Facebook acted similarly, first removing a video uploaded by ICAN on July 7, 2020, then removing several additional videos, and finally "unpublishing" the HighWire Facebook page on November 21, 2020. *Id.* ¶¶ 73-74.  Prior to the COVID-19 pandemic, Defendants had "almost never" objected to or removed ICAN's postings. *Id.* ¶ 3; *see also id.* ¶¶ 68, 75, 78, 88.

### C. ICAN's Allegations of Government Pressure

ICAN contends that the genesis of its account suspensions dates back to the 2016 election, when it became apparent that Defendants' platforms were "extensively used and relied upon [as] political news and information tools," including by a Russian intelligence agency aimed at disrupting the United States presidential campaign. *Id.* ¶ 32.  As a result, Defendants began to face "immense scrutiny from Congress, law enforcement authorities, and the public" about "the role played by Defendants' platforms in the Russian interference." *Id.* ¶ 33.  Members of Congress considered legislation that would "make Defendants' businesses more accountable,"

2

including the potential elimination of Section 230 immunity.[1] *Id.* ¶ 34. House Intelligence Committee Chairman Adam Schiff and then-presidential candidate Joe Biden publicly criticized Section 230, thereby "hold[ing] the proverbial Sword of Damocles over the social media companies' heads." *Id.* ¶¶ 35-36, 38. "[I]f the companies did not comply with the demands made by the government officials with regard to foreign interference, they would lose the current legal regime that they deem essential to their continued growth." *Id.* ¶ 38.

Ultimately, Schiff's focus and that of other elected officials shifted "from safeguarding our elections from foreign interference, to limiting information regarding vaccines." *Id.* ¶ 13. On February 14, 2019, Schiff wrote a letter to the Chief Executive Officer of Google, YouTube's parent company, to gather information about what the company was doing to "curb vaccine 'misinformation.'" *Id.* ¶ 42. He sent a similar letter to Facebook, expressing concern that "Facebook accepts paid advertising that contains deliberate misinformation about vaccines," and urging the company "to take more active steps to curb vaccine 'misinformation.'" *Id.* ¶ 43. According to ICAN, "Schiff's letters did not reference Section 230 directly, but after the pressure applied following the Russia scandal, he did not need to." *Id.* ¶ 44. Schiff received responses from Google and Facebook stating that they were "put[ting] a lot of effort into curbing misinformation" and working to "reduce the spread of inaccurate information." *Id.* After these letters, Defendants began "exploring the removal of 'anti-vaccine' information." *Id.* Facebook issued a press release detailing its commitment to curbing misinformation by "reducing its distribution," rejecting "ads that include misinformation," and removing ad targeting options like "vaccine controversies." *Id.* ¶ 46.

As the COVID-19 pandemic began to spread, Schiff "once again applied governmental pressure and wrote to [Defendants], this time expanding his censorship of 'vaccine misinformation' to also include 'coronavirus misinformation.'" *Id.* ¶ 47. He told Defendants "that

---

[1] 47 U.S.C. § 230 "protects online hosting and social media companies . . . against a range of laws that might otherwise be used to hold them legally responsible for what their users say and do." FAC ¶ 4. ICAN contends that reforms to Section 230 would require platforms like YouTube and Facebook "to significantly censor their users' postings (which would decrease traffic) or risk enormous liability from defamation actions." FAC ¶ 6.

the best practice is to 'remove or [downgrade] all harmful content before users engage with it' and urged them to adopt policies similar to that of Facebook to tackle coronavirus misinformation." *Id*. He also "engaged 'directly with the companies' on the issue of vaccine misinformation." *Id.* ¶ 50 (citing a *Politico* news report). Once again, Schiff received a response, this time from YouTube stating in part "[w]e are committed to working with [m]embers of Congress as well as health experts around the world to better understand these challenges as we continue developing robust policy and product improvements that help keep people safe." *Id.* ¶ 49.

Beyond Schiff's public comments about vaccine and coronavirus misinformation, ICAN alleges that "[o]ther federal officers have made public statements demonstrating the continuous coercion exerted by Congress on Defendants" across several topics. *Id.* ¶ 52. For example, House Judiciary Committee Chairman Jerrold Nadler expressed an interest in "pressuring" technology companies. *Id.* ¶ 53. Congressman Cedric Richmond called on social media platforms to self-regulate or face increased governmental regulation, and Congresswoman Maxine Waters posed questions to Facebook Chief Executive Officer Mark Zuckerberg during a Congressional hearing about steps the company was taking to combat election-related misinformation. *Id.* ¶¶ 54, 58. Members of Congress also wrote to social media companies with recommendations on how to limit the spread of census misinformation, which was followed by Defendants updating their policies related to census misinformation. *Id.* ¶¶ 56-57. ICAN alleges that it was in response to these "pressure tactics," and particularly the threats to Section 230, that Defendants implemented misinformation policies and restricted or terminated ICAN's ability to share information on Defendants' platforms. *Id.* ¶¶ 6-7, 9-11, 56.

### D. Procedural Background

ICAN filed its initial complaint on December 30, 2020, ECF No. 1, and the amended complaint ("FAC") on March 29, 2021, ECF No. 42. The FAC contains a single cause of action alleging that Defendants violated ICAN's First Amendment rights by restricting its ability to post information on Defendants' platforms.[2] *Id.* ¶¶ 85-94. ICAN seeks injunctive relief ordering

---

[2] In its complaint, ICAN states that it seeks relief under the implied cause of action articulated in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See*

4

1    Defendants to restore ICAN's accounts and barring the social media platforms from restricting

2    ICAN's speech in the manner described in the FAC.  *See* Prayer for Relief, FAC at 32.

3          Defendants filed this motion to dismiss the FAC on April 12, 2021.  ECF No. 47.  ICAN

4    has filed an opposition, ECF No. 52, to which Defendants replied, ECF No. 53.

## II.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III.  LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). A complaint need not contain detailed factual allegations, but facts pleaded by a plaintiff "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). The court is not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted).

## IV.  DISCUSSION

Defendants rest their motion to dismiss on three separate grounds. First, they argue that ICAN cannot state a claim against Defendants for violation of their First Amendment rights because Defendants are not state actors. ECF No. 47 at 15-16. Second, they argue that ICAN cannot rely on *Bivens* as a basis for a claim against a private corporation. *Id.* at 22-24. Third,

---

FAC ¶¶ 85-94.  ICAN clarifies in its opposition that it is not seeking the damages provided for by a *Bivens* claim and instead seeks solely injunctive relief.  ECF No. 52 at 29.

Defendants argue that their own First Amendment right to make editorial decisions about the content included on their platforms bars ICAN's claim for injunctive relief. *Id.* at 24-25. Because the Court finds that Defendants are not state actors or subject to liability under the state action doctrine, it grants Defendants' motion on that basis without reaching their remaining arguments.

### A.     State Action

A "private entity is not ordinarily constrained by the First Amendment." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). However, such an entity may be recognized as acting as though the state in certain limited circumstances.[3] *See Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003). The Ninth Circuit has "recognize[d] at least four different criteria, or tests, used to identify state action: (1) public function; (2) joint action; (3) government compulsion or coercion; and (4) governmental nexus." *Id*. (internal quotation marks and citation omitted). The inquiry to determine whether a private entity is acting through the state is "necessarily fact-bound." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982). "[T]here is no specific formula for defining state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983). "At bottom, the inquiry is always whether the defendant has exercised power possessed by the virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 748 (9th Cir. 2020) (internal quotation marks and citation omitted).

To state a claim under the First Amendment, ICAN must plausibly allege that Defendants' termination of the ICAN accounts on their platforms is properly recognized as an exercise of state action. ECF No. 47 at 15-16. ICAN argues that it has made such a showing under either the joint action test or government compulsion test. ECF No. 52 at 17.

#### 1.     Joint Action

"[P]rivate actors can be state actors if they are 'willful participant[s] in joint action with the state or its agents.'" *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1231 (9th Cir. 1996).

---

[3] The standard for demonstrating whether a private entity's actions constituted federal or state action is identical, and a court may rely on precedent in either context to inform a state action analysis. *See Kitchens v. Bowen*, 825 F.2d 1337, 1340 (9th Cir. 1987).

(quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). "[J]oint action exists when the state has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Tsao v. Desert Palace*, 698 F.3d 1128, 1140 (9th Cir. 2012) (internal quotation marks and citation omitted). This type of action requires "a substantial degree of cooperative action." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).

ICAN makes two arguments in support of its theory that Defendants acted as state actors under the joint action test. First, ICAN argues that the FAC plausibly alleges joint action based on the statements made by Defendants and members of Congress, namely Congressman Schiff's commitment to "'monitoring the effectiveness of the changes' in policies made by Defendants," and Defendants' reciprocal "commit[ment] to working with [m]embers of Congress." ECF No. 52 at 25 (quoting FAC ¶¶ 44-45, 49). Second, ICAN argues that the FAC alleges that Defendants censored ICAN in accordance with "rule[s] of decision" supplied by the Government. *Id.* at 24 (citing *Mathis v. Pac. Gas and Elec. Co.* ("*Mathis I*"), 891 F.2d 1429, 1434 n.7 (9th Cir. 1989) as holding that "[t]he crucial question is whether the government or someone independent of the government provides the 'rule of decision.'"). ICAN contends that "[b]y choosing to use governmental sources as the authoritative truth, or rule of decision . . . Defendants created a system of cooperation and interdependence with the government where Defendants explicitly chose to involve the government in nearly every one of its decisions." *Id.* at 24 (internal quotation marks and citation omitted). Neither argument holds water.

First, neither Defendants' public statements indicating their intent to work with Congress, nor the statements by members of Congress urging Defendants to take action, nor the media reports of unspecified collaboration between Defendants and Schiff are sufficient to show that the Government was a "joint participant in the challenged activity." *Tsao*, 698 F.3d at 1140 (9th Cir. 2012). An examination of relevant precedent demonstrates the degree of cooperation and interdependence required for joint action.

In *Tsao*, the Ninth Circuit held that casino security guards who were empowered to issue "a citation to appear in court" were state actors. *Id.* at 1140. The security guards had attended a

7

1    training course given by the Las Vegas Municipal Police Department ("LVMPD"), after which
2    they were permitted to issue summons to trespassers at the casino, a power normally held
3    exclusively by the state. *Id*. The LVMPD also frequently shared records regarding suspected
4    trespassers with casino security. *Id*. Following her arrest for trespass by casino security guards,
5    Tsao brought a Section 1983 claim against the casino for wrongful arrest. *Id.* at 1138. The court
6    held that "[b]y training [casino] security guards, providing information from the records
7    department, and delegating the authority to issue citations," LVMPD had "so far insinuated itself
8    into a position of interdependence with [the casino] that it must be recognized as a joint participant
9    in the challenged activity." *Id*. at 1140 (quoting *Gorenc v. Salt River Project Agric. Improvement
10   & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989)).

11   Unlike *Tsao*, the complaint here does not allege that Defendants were trained by or
12   received records from a government entity for the purposes of content moderation, or that
13   Defendants were exercising any delegated governmental authority. Instead, ICAN supplies only
14   statements from elected and corporate officials reflecting little more than a shared interest in a
15   problem of misinformation. *See, e.g.*, FAC ¶ 42 (quoting Schiff's letter to Google as saying "[a]s
16   a Member of Congress who is deeply concerned about declining vaccination rates around the
17   nation, I . . . encourage further action [] be taken related to vaccine misinformation"); *id.* ¶ 45
18   (quoting Schiff's Twitter post that "[t]he ultimate test will be if these measures reduce the spread
19   of anti-vaccine content on their platforms, to the benefit of public health"); *id.* ¶ 47 (stating that
20   "Schiff's letter reminded [Defendants] that the best practice is to 'remove or [downgrade] all
21   harmful content before users engage with it' and urged them to adopt policies similar to that of
22   Facebook to tackle coronavirus misinformation"). These allegations are insufficient. *See Mathis
23   v. Pac. Gas & Elec. Co.* ("*Mathis II*"), 75 F.3d 498, 503 (9th Cir. 1996) (rejecting notion that a
24   government entity's "regulatory interest in a problem transforms any subsequent private efforts to
25   address the problem (even those expressly designed to obviate the need for regulation) into state
26   action.").

27   Similarly, in *Rawson*, the Ninth Circuit found a private hospital to be a state actor when it
28   involuntarily committed and forcibly injected plaintiff with antipsychotic medications. 975 F.3d

8

at 757. The litany of factors supporting this finding included "the necessity of state imprimatur to continue detention, the affirmative statutory command to render involuntary treatment, the reliance on the State's police and *parens patriae* powers, the applicable constitutional duties, the extensive involvement of the county prosecutor, and the leasing of [the private hospital's] premises from [a state entity]." *Id.* In particular, *Rawson* noted that "the county prosecutor played an outsized role in the duration of Rawson's detention" which supported the conclusion that the private hospital "cooperate[d] with the executive arm of the State." *Id.* at 754.

An equivalent level of detailed interdependence, linking the actions of government officials to challenged conduct by Defendants, is absent here, as the FAC does not allege that Defendants relied on formal governmental authority in developing and enforcing their content moderation protocols. Instead, a more apt comparison to the instant case is the plaintiff's unsuccessful theory of state action in *Children's Health Defense v. Facebook, Inc.*, Case No. 20-cv-05787-SI, 2021 WL 2662064, at *1 (N.D. Cal. June 29, 2021). Children's Health Defense ("CHD"), a nonprofit organization, claimed that Facebook had violated its First Amendment rights by flagging CHD's vaccine-related content as "false" or "misleading." *Id*. CHD alleged that Facebook's conduct constituted state action, as the company jointly acted with the CDC, among other government agencies. *Id*. at *10. Judge Illston granted Facebook's motion to dismiss, explaining that "general statements by the CDC and Zuckerberg about 'working together' to reduce the spread of health or vaccine misinformation . . . do not show the government was a 'joint participant in the challenged activity.'" *Id.* at *11. CHD's pleading, the court found, contained insufficient facts to "support the inference that Facebook (or Zuckerberg) worked in concert with the CDC to censor CHD's speech, retaliate against CHD, or otherwise violate CHD's constitutional rights." *Id.* Like CHD, ICAN asks the Court to infer that the statements by government and corporate officials were part of a larger collaboration which led Defendants to remove ICAN from their platforms. These allegations are not plausible. *See id.* at *8.

Second, ICAN misapplies the "rule of decision" framework articulated by *Mathis I*. Mathis had been employed by a contractor working at a nuclear power plant owned by Pacific Gas and Electric ("PG&E") when PG&E accused him of violating its drug policies and denied him

access to PG&E facilities without a hearing. 891 F.2d at 1430. Because he could no longer come to work, Mathis's employment was terminated. *Id.* In his complaint, Mathis alleged that PG&E was a state actor because the governmental Nuclear Regulatory Commission ("NRC") had "directed or encouraged" PG&E to deny Mathis access. *Id*. at 1433. The Ninth Circuit found that the complaint for state action based on the relationship between the NRC and PG&E was not "frivolous or wholly without substance." *Id*. at 1434. The court observed that the NRC instituted regulations after Mathis's termination which granted "no deference . . . to decisionmaking by qualified professionals according to standards independent of the government." *Id.* The court went on to elaborate that the NRC regulations dictated "a minimum acceptable industry plan, backed up by threats of enforcement or of formal rulemaking." *Id*. Accordingly, the Ninth Circuit held that if Mathis could show that at the time of his termination PG&E maintained "an informal policy equivalent to the policy [NRC] published [after Mathis's termination], he may be able to establish that PG&E's action can [also] be ascribed to a governmental decision." *Id*. (internal quotation marks and citation omitted).

In an apparent contradiction, ICAN states that Defendants developed their rules "based exclusively" on government requirements, FAC ¶ 59, but also observes that the platforms looked to a variety of authorities for medical information. For example, while Facebook explicitly recognized the CDC as *an* authority for information, FAC ¶ 61, it looked to several "global" and "local health authorities" in developing its rules for restricting COVID-19 related content, FAC ¶ 60. The FAC alleges that YouTube similarly emphasized the variety of authorities to which it looked for guidance, including the World Health Organization ("WHO"). *Id*. Based on these allegations, it would be more accurate to describe the rules of decision that Defendants followed as composites assembled by the platforms themselves rather than imposed by or imported intact from the Government.[4] Thus, ICAN fails to allege that "governmental direction . . . dictate[s] . . . *the* standard for decision." *Mathis I*, 891 F.2d at 1432 (emphasis added).

---

[4] Additionally, "allegations involving non-federal actors, such as the WHO . . . are irrelevant to determining whether [a plaintiff] has plausibly alleged joint action." *CHD*, 2021 WL 2662064, at *10. Accordingly, Facebook's decision to look to the WHO further suggests that the federal government has not created a "rule of decision."

10

Moreover, even if Defendants had looked exclusively to a single government authority, their activities nonetheless involved "the independent professional judgments" which defeat the "requisite nexus to the government" to establish joint action. *Id.* For one, ICAN's complaint fails to allege that the Government caused Defendants to adopt the rules set by particular governmental authorities as their own rules of decision. *See CHD*, 2021 WL 2662064, at *12 (That "Facebook may have relied on CDC information about vaccines to determine what information is 'misinformation[]' . . . is not enough to show that Facebook's actions were 'compelled' by any particular CDC 'standard of decision.'"). Moreover, the guidelines that Defendants allegedly adopted as the basis for their rules stem from "medical information" promulgated by health officials to guide public behavior, not to moderate online conduct. *See* FAC ¶¶ 60-61. By adopting a public health framework to guide decisions about content moderation, Defendants by definition maintained "independent professional judgment" to make decisions about the content on their platforms. In *Blum v. Yaretsky*, the Supreme Court determined that a comparable display of "independent professional judgment" – doctors using a government-created form and suggested standards to guide patient transfer decisions – precluded a finding of joint action. 457 U.S. 991, 1008-09 (1982). Even with the government-designed forms, the Court found that the patient transfer decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* The same is true here – that Defendants maintain their "independent professional judgment" even while relying on government-created guidelines.

The Court concludes that ICAN has not alleged that Defendants were state actors under a theory of joint action.

### 2. Compulsion

Government compulsion exists "[w]hen the State has commanded a particular result" and "removed that decision from the sphere of private choice." *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963). For a private party's conduct to constitute state action under a compulsion theory, it must involve "such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004-1005

(1982). "To plead such a claim, a party must allege that the government 'commanded a particular result in, or otherwise participated in, his specific case.'" *Doe v. Google LLC*, No. 20-CV-07502-BLF, 2021 WL 4864418, at *3 (N.D. Cal. Oct. 19, 2021) (quoting *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020))." Plaintiffs must point to a "state regulation or custom having the force of law that compelled, coerced, or encouraged" the alleged private conduct. *Johnson v. Knowles*, 113 F.3d 1114, 1120 (9th Cir. 1997). "[I]n a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999). Rather, there must be "some additional nexus that made it fair to deem the private entity a governmental actor in the circumstances." *Id.* at 839.

ICAN argues that Defendants' challenged conduct was taken as "a result of governmental coercion." ECF No. 52 at 18. To reach this conclusion, ICAN strings together the following chain of inferences: First, prior to Schiff's "pressur[ing]" of Defendants in 2019 and 2020, "Defendants almost never censored any of [ICAN's] content." *Id.* (citing FAC ¶¶ 3, 88). This was so, ICAN contends, because censorship of any kind "runs contrary to Defendants' economic interests because their business models are premised on making content 'go viral' and then selling advertising with that content." *Id.* (citing FAC ¶ 88). However, following Russian interference in the 2016 election, members of Congress "used threats and pressure to force Defendants to change their policies regarding censoring foreign influences in elections." *Id.* at 19 (citing FAC ¶¶ 32-38). This led to a pattern, "whereby [m]embers of Congress successfully pressured the Defendants to change policies regarding censoring information on their websites," including, eventually, information about COVID-19. *Id.* Ultimately, Defendants "would bend to any request if they thought that Section 230 was in danger." *Id.* (quoting FAC ¶ 40). Because "Defendants created misinformation policies that mirrored [Schiff's] desires, and used those policies to de-platform [ICAN]," and only did so after "Schiff began to complain about vaccine and COVID-19 related misinformation," ICAN argues that it has plausibly pleaded that "Schiff's statements were the actual motivating factor to get Defendants to change their policies." *Id.* at 21-22. This logic fails

12

for a host of reasons.

First, the complaint does not allege "state" coercion. Simply put, "[t]he publicly expressed views of individual members of Congress – regardless of how influential – do not constitute 'action' on the part of the federal government." *Daniels v. Alphabet, Inc.*, No. 20-cv-04687-VKD, 2021 WL 1222166, at *6 (N.D. Cal. Mar. 31, 2021); *see also Abu-Jamal v. Nat'l Pub. Radio*, 1997 WL 527349, at *6 (D.D.C. Aug. 21, 1997) (finding no state action in NPR's decision to not air a controversial program because even if "individual members of Congress did call NPR in attempts to pressure it not to air the program, not one of these people has any *legal control* over NPR's actions" (emphasis added)). This by itself dooms ICAN's argument.

ICAN's authority is not to the contrary. Rather, the cases on which ICAN relies address situations in which the alleged government threats were buttressed by the potential exercise of legal authority or the threat of criminal prosecution – capabilities individual members of Congress lack. *See Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987) (finding coercion where the coercive conduct was the threat of prosecution made by a deputy county attorney who had legal authority to act on the threat); *United States v. Stein*, 541 F.3d 130, 151 (2d Cir. 2008) (concluding that a federal prosecutor's "threat of indictment" constituted government compulsion and transformed defendants' employer into a state actor).

Second, ICAN has not supported with factual allegations its inference that Defendants acted against their economic interests because of government coercion, relying instead on a post hoc fallacy. *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005) ("[P]roving a *temporal* relationship . . . does not establish a *causal* relationship."). Not only does the ICAN fail to allege lack any factual basis for its conclusion that content moderation is contrary to Defendants' business interests, FAC ¶ 88, it also fails to provide any authority to show that an act against a private entity's economic interest demonstrates government compulsion.

Third, ICAN's argument for compulsion is insufficient to plead that the government "commanded a particular result in, or otherwise participated in, [ICAN's] specific case." *Heineke*, 965 F.3d at 1014; *see also Yaretsky*, 457 U.S. at 1010 (no state action where nursing home regulations in question did "not dictate the decision to discharge or transfer in a particular case").

1 Nowhere does ICAN allege that Government actors played a role in Defendants' decisions to 2 restrict and terminate ICAN's accounts on their platforms. The statements by Schiff and others 3 and media reports of engagement between Defendants and members of Congress "are too general 4 and amorphous to constitute coercive action with respect to the specific challenged actions in this 5 case." *CHD*, 2021 WL 2662064, at *15 n.10.

Finally, even if the alleged statements by members of Congress constituted acts of coercion, the complaint still lacks the "additional nexus that ma[kes] it fair to deem the private entity a governmental actor." *Sutton*, 192 F.3d at 839. ICAN argues that the nexus requirement is satisfied by its allegations that the government and Defendants were engaged in "extensive joint action participation" and its allegations that "Schiff and others knew that Defendants were fearful of losing the protection provided by Section 230 and they 'would bend to any request if they thought that Section 230 was in danger.'" ECF No. 52 at 27-28 (quoting FAC ¶ 40). Neither provides the required nexus. As considered above, ICAN fails to plausibly allege joint action between the Government and Defendants. And the argument that the threats to Section 230 provide a nexus that transform Defendants into government actors, like the rest of ICAN's government compulsion argument, lacks factual support and relies on unsupported inferences. As such, the Court cannot find that ICAN adequately pleaded its theory of coercion.[5]

In sum, the Court concludes that ICAN has failed to plausibly allege that Defendants were acting as "state actors" in the removal of ICAN accounts from their platforms. Accordingly, ICAN fails to state a claim against Defendants for violation of its First Amendment rights. *See Halleck*, 139 S. Ct. at 1930.

### B. Leave to Amend

Defendants ask the Court to dismiss ICAN's complaint with prejudice. Under Federal

---

[5] This holding does not preclude the possibility that the actions of a social media company could be attributed to the state through a theory of coercion. *See Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226-27 (2021) (Thomas, J., concurring) ("Under [the government coercion] doctrine, plaintiffs might have colorable claims against a digital platform if it took adverse action against them in response to government threats. . . . What threats would cause a private choice by a digital platform to be deemed . . . that of the State remains unclear." (internal quotation marks and citations omitted)).

14

Rule of Civil Procedure 15(a), leave to amend is freely given when justice so requires. The Court may, however, "exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

It seems doubtful that ICAN could plead the factual allegations necessary to show that Defendants' content moderation activities, and specifically their moderation of ICAN's accounts, constituted state action. However, recognizing the liberal standard in favor of granting leave to amend, the Court will dismiss the complaint without prejudice.

## CONCLUSION

For the reasons discussed above, the Court grants Defendants' motion to dismiss without prejudice. ICAN may file an amended complaint solely to correct the deficiencies identified in this order. An amended complaint is due 21 days from the date of this order. If no amended complaint is filed, the Court will dismiss the case with prejudice.

**IT IS SO ORDERED.**

Dated: January 31, 2022

_____
JON S. TIGAR
United States District Judge